F. M. Lyman v. Enoch F. Martin et al.

**F. M. LYMAN, Respondent, v. ENOCH F. MARTIN et al., Appellants.**

1. ENACTMENT OF LAWS, ETC.—A committee had been appointed by a preceding Legislature to compile and publish the laws *then in force* in the Territory. Whereupon such committee performed the labor required of them, and reported the result, when the following act was passed: "Be it enacted, that the Compiled Laws of Utah," published under the auspices of the Special Committee * * * "are hereby approved and adopted." *Held*, That such act did not amount to the enactment of any new law, but was simply an approval of the work of the committee.

2. PRESUMPTION OF AN ACT BEING A PROPER LAW.—Where an act is found among the laws passed by the Legislature, and is published by authority as one of the laws of the Territory, and is found in the records of the Secretary of the Territory, authenticated and approved in the usual manner, these facts raise a strong presumption of the existence and regular passage of the law, and the burden is upon any one attacking the validity of such law to overcome this presumption.

3. MANDAMUS—PLEADINGS IN.—The alternative writ and the return thereto are usually regarded as constituting the pleadings in proceedings by mandamus, the writ standing in the place of the declaration or complaint, and the return taking the place of the answer in an ordinary action at law.

4. CANVASS OF ELECTION RETURNS.—Under section 18, of the election law of 1878, it is plainly the duty of the county clerk and the County Court to canvass the returns of an election.

5. QUALIFICATIONS OF VOTERS.—While the exercise of the elective franchise is a privilege rather than a right, yet all regulations upon the subject must be reasonable, uniform and impartial, and that portion of the election law of 1878, which provides that all *male* voters shall be taxpayers, without imposing the same conditions upon the female voters, is void and of no effect.

6. QUALIFICATIONS OF VOTERS.—This provision being void, does not necessarily render the entire act void, but can be stricken out, leaving the remainder of the law in force.

7. DEMAND ON COUNTY COURT.—The Statute makes it the duty of the County Court to canvass the returns of an election, and this being a public duty required of the members of such court, no demand upon them is necessary, before proceeding to compel the performance of such duty.

8. MANDAMUS—A CIVIL ACTION.—The proceeding by mandamus is a civil remedy having all the qualities and attributes of a civil action, and the sufficiency of the pleadings therein must be determined by the same rules as in civil actions.

9. ALLEGATIONS OF CONCLUSIONS OF LAW.—In response to a proceeding in mandamus, the answer alleged "that defendants had fully passed upon said returns and canvassed the same," is simply a statement of a legal conclusion, and tenders no material issue. The board of canvassers possesses no such judicial functions.

10. MINISTERIAL AND JUDICIAL ACTS.—When a ministerial officer leaves his proper sphere attempts to exercise judicial functions, he is exceeding the limits of the law, and is guilty of usurpation.

Appeal from the Third Judicial District Court.
The facts appear in the opinion.

*R. N. Baskin*, for appellants.
No brief on file.

*Sheeks & Rawlings*, for respondent.

The question of greatest general importance is as to whether, in any event, the court will look into the Legislative Journal to ascertain whether a law has passed or otherwise? When an act has passed both branches of the Legislature, it is engrossed under the supervision of a Legislative committee. The fact of its passage is, after its enrollment, further indicated by the signatures of the presiding officers of both houses, so authenticated, the act is sent to the Governor, who, without further evidence, is accustomed to approve or disapprove it. If the Governor approve the act, it is deposited with the Secretary of the Territory, whose duty it is to record and preserve it.

The act in question is found in the records of the Secretary, authenticated and approved in the manner above pointed out. This is the "original" record of the statute and constitutes conclusive evidence of its existence. No extrinsic evidence of any kind is admissible to impeach it. The Journal, if the Legislature keep one, is made up by clerks who are no part of the Legislative body. It may be read or not, at the option

·of that body. Finally, the Journal is not signed nor authen-·ticated by any member of the legislature present and cogniz-·ant of the proceedings. On the other hand, the enrolled statute on the files of the Secretary is, in the first instance, engrossed by a legislative committee, it is further authenti-cated by the presiding officers of the two branches by their signatures, two persons who are personally cognizant of every step through which the act passes, and best fitted to determine whether it has received the requisite legislative assent or not. That the enrolled statute is the best evidence of its passage, not only has reason in its favor, but, it is submitted, is clearly established by authority.

Such was the English common law in relation to acts of Parliament, and the decisions of a majority of the States where the question has been passed upon are to the same effect. *King* v. *Arundel*, Hobart, 110, 111; Prince's Case, 8 Coke, 28; 3 Black. Com. 331; *State* v. *Young*, 5 Am. L. Reg. 679, (N. J.); *Sherman* v. *Story*, 30 Cal. 253; *People* v. *Burt*, 43 Cal. 560; *State* v. *Swift*, 10 Nev. 176; *Duncombe* v. *Prindle*, 12 Iowa, 11; *Eld* v. *Gorham*, 20 Conn. 12; *Foulke* v *Flem-ming*, 13 Md. 412; *Pacific Railroad* v. *Governor of Missouri*, 23 Mo. 353; *People* v. *Highways*, 54 N. Y. 276; *People* v. *Supervisors Chenango Co.*, 8 N. Y. 317; *Lou'siana Lottery Co.* v. *Richoux*, 23 La. Ann. 743; s. c., 8 Am. Rep. 602; *Bless-ing* v. *Galveston*, 42 Texas, 641.

The assertion that defendants examined said returns and canvassed the force, effect and legality of the same, states no fact, but simply a conclusion of law. It does not show a per-formance of duty, but the allegation that they rejected the returns shows a violation of it. In no event are the canvassers given authority to reject wholesale the returns of election. In support of the foregoing propositions, see the following author-ities: *Kisler* v. *Cameron*, 39 Ind. 488; Moses on Mandamus, 90; *Commonwealth* v. *Commissioners*, 37 Pa. St. 279; High on Ex. Rem. § 56; *State* v. *County Judge, etc.*, 7 Iowa, 186;

*State* v. *Bailey*, 7 Iowa, 390; Cooley's Const. Lim. 622, and cases there cited.

The above authorities show the duties of the board to be ministerial, and that their performance will be compelled by mandamus. The following relate to the efficiency of facts in the return or answer: 5 Wait's Pr. 585; 3 Estee, 916; *Gorgas* v. *Blackburn*, 14 Ohio, 256; *People* v. *Supervisors of S. F.*, 27 Cal. 675.

A denial that the returns were "securely sealed" or that the ballot boxes were securely sealed, does not raise an issue. It is an admission that they were *sealed*. How *securely* is unimportant. *People* ex rel. *Warner Lake* v. *Henry Higgins*, 3 Mich. 235; Affirmed in *People* v. *Chicotte*, 16 Mich. 283; Cooley's Const. Lim. 617, 618; Pomeroy's Rem. and Remedial Rights, §§ 618, 619.

The presumption is that the returns of election have been properly kept, as the law requires. *People* v. *Chicotte*, 16 Mich. 283.

The answer admitting the returns to have been sealed in some way, that is, made secure, does not aver any kind of opening of said returns. In truth, it alleges no fact showing a performance of duty.

In this case, where the duty devolving upon defendants is clearly pointed out by statute and to be performed for the public benefit, and the time when they are to act pointed out, a demand to canvass was not essential, and a denial of it does not raise a material issue. *State* v. *County Judge*, 7 Iowa, 186; *State* v. *Baily*, 7 Iowa, 390; *Humboldt Co.* v. *Com. Churchill Co.*, 6 Nev. 39; 37 Pa. St. 237, *supra*.

EMERSON, J., delivered the opinion of the court.

This was an application by the respondent to the Third District Court for a writ of mandamus to compel the appellants, the said Martin being county clerk, and the other defendants constituting the County Court of Tooele County, to canvass

the returns of an election held in that county on the 5th day of August, 1878, to fill various offices.

The affidavit shows that the respondent was a candidate voted for at that election to fill each of the following offices, viz.: That of Representative from said county to the next Legislative Assembly, and County Recorder of said county. That none of the defendants were publicly known to have been candidates voted for at said election; that the returns from all the precincts were in the possession of said Martin and members of the County Court on the 9th day of August, 1878; that all the ballot boxes were securely sealed or locked; that envelopes securely and safely sealed containing the lists required by law to be kept, addressed to said clerk from the precincts named were then and there in the possession of said clerk; that on the day last named the respondent demanded of the appellants that they examine said returns and canvass the same as required by law, and that they then and there refused to examine and canvass said returns or any of them, either at that time or at any time, etc.

An alternative writ was prayed for, which was granted. The appellants' demurred to the writ, and upon its being overruled they answered. The respondent demurred to this answer. The demurrer to the answer was sustained, and a peremptory writ ordered, the appellants electing to stand upon their answer. They now prosecute this appeal.

The first exception in this appeal relates to the overruling of the appellants' demurrer to the alternative writ.

The demurrer was based upon two grounds:

*First*—That at the date of the election there was no election law in force.

In support of this ground it is urged that the Legislative Assembly, in passing an act approving and adopting the Compiled Laws of Utah, re-enacted the old law, subsequent to the passage of the election law in question, and was therefore a repeal of the latter by implication. The only evidence in support of this proposition is the fact that both acts were

approved by the Governor on the same day, and are in the same message from him notifying the assembly of their approval.

No inference can be drawn from this that the act in relation to the Compiled Laws was passed subsequent to the passage of the act in relation to elections.

And even if it should positively appear that the act approving and adopting the Compiled Laws was passed a day or any number of days subsequent to the passage of the "Election Bill," it would not have the effect claimed for it by the appellant.

The words of the act referred to are as follows:

"*Be it enacted*, etc., That the 'Compiled Laws of Utah,' published under the auspices of the special committee * * * are hereby approved and adopted."

A committee had been appointed by the preceding Legislature to compile and publish the laws then in force in the Territory. That committee had performed the duty assigned them, and the result of their labor was then before the Legislature, and the act passed simply amounted to an approval of their work. It is plain that the Legislature did not intend that it should have any other or further effect, and in law it did not. It was not a revision of the law that had been authorized, but a compilation only. If the committee had included in the compilation any provision not found among the old laws, one which had never been passed by the Legislature, the legislative action above referred to would not have given it any force or validity as a law.

The second ground of demurrer was " That the election law, approved February 22, 1878, under which the election was was held, never passed." What is meant by this is, that the *bill* was never passed so as to become a *law*.

To sustain this proposition counsel relies upon the following facts gleaned from the journal entries of the two houses:

The bill was first passed by the Assembly and sent to the Council, where it was passed with certain amendments. On

SUPREME COURT

its being returned to the Assembly that body concurred in all the amendments made by the Council except one. Upon the disagreement as to that a committee of conference was appointed.

That committee agreed to certain amendments to sections eight and nine of the bill, and on the report of the committee on the part of the Assembly, that body concurred in the amendments proposed by the conference committee. The bill being then sent to the Council, that body also "adopted" the report of the committee and returned the bill to the Assembly for enrollment, it having originated in that body. The next entry in relation to the act is the notice received of its approval by the Governor in connection with the act in relation to the compiled laws.

Counsel for the appellants claim, that after the adoption of the amendments agreed upon by the conference committee, the bill as amended should again have been passed by both branches of the Legislature.

In this we think he is mistaken. Whatever may be found to the contrary in works upon parliamentary proceedings such is not the usual custom in legislative bodies.

In looking over the legislative journals of many of the States, to which we have had access, as well as the proceedings of Congress, it seems to be the universal custom, when there is a disagreement as to amendments to a bill passed by both houses, which has been settled by a conference committee, to concur in the amendments recommended by them.

But it is claimed, on the part of the respondent, that the act in question is found among the laws of the twenty-third session of the Legislature, published by authority as one of the existing laws of the Territory, and is also found in the records of the Secretary, authenticated and approved in the proper manner, and that these facts raise a strong presumption of the existence and regular passage of the law, and that the burden was upon the appellants to overcome this presumption and show the contrary. This proposition is correct,

and waiving the question raised and discussed upon the argu-
ment as to the right to look into the journal, a question
which we do not decide, the journal entries produced not only
fail to rebut this presumption, but affirmatively show that all
the necessary steps were taken resulting in the regular passage
of the act. There was no error in overruling the appellants'
demurrer.

After the demurrer was overruled, the appellants answered,
and the respondent demurred to the answer on the ground that
it did not state facts sufficient to constitute a defense, which
was sustained, and a peremptory writ ordered, the appellants
electing, as before stated, to stand upon their answer.

The second exception in the record relates to the action of
the court in sustaining this demurrer; and the first point
made under this exception is " that this demurrer reaches back
to the first defect in the pleadings, and if the plaintiffs' plead-
ing is defective in substance, judgment should be given for
respondents in the demurrer to the answer."

This proposition is undoubtedly correct, but the deductions
that counsel desires to draw from it are not so clear, viz., that
the affidavit is one of the pleadings in the case, as his whole ar-
gument on this point is confined to what he deems to be defects
in the affidavit. " The alternative writ and the return thereto are
usually regarded as constituting the pleadings in proceedings
by mandamus—the writ standing in the place of the declar-
ation or complaint, and the return taking the place of the plea
or answer in an ordinary action at law." *State* v. *Gracey*, 11
Nev. 223.

But if we concede that the affidavit is a " pleading" in the
case, and it is that and not the writ which is to be answered,
how will the case stand then?

Counsel for the appellants claim that there are several vital
defects in the affidavit, because:

" *First*—It is not shown that it is the specified duty of the
defendants to canvass the vote, and the election law of 1878
does not enjoin upon them any such duty."

Section 18 of the act provides that " on receipt of the ballot boxes and returns of election, the clerk of the county court, in the presence of at least one member of the county court, who is not publicly known as a candidate voted for at such election, shall break the seal of the returns, and all candidates may be present, as provided in section 15 of this act, and said clerk and member or members of the county court shall carefully examine the returns, and if no irregularity or discrepancy appears therein, affecting the result of the election of any candidate, they shall accept said returns as correct." *   *   * And then follows certain directions as to what shall be done in case the right of any one voted for for any office is in any way affected. And in section 19 directions are ·given how to proceed in case of any disagreement in the returns in regard to the number of votes cast for any Territorial officers, or any officer whose election is affected by the votes of more counties than one, and proceeds: " After the completion of the canvass, said member or members and clerk of the county court shall declare the result thereof, and the clerk of the county court shall immediately make out and transmit a certificate of election to each person elected to any precinct or county offices."

There would seem to be no room for doubt but that the statute plainly and specifically points out the duty of the clerk and member of the county court, and just as plainly enjoins upon them the performance of that duty.

The precise language of the objection is that it is not shown that it was the duty of the appellants " to canvass the vote." Neither in the affidavit or writ is this asked or commanded to be done. But they are asked and commanded to go forward and canvass the returns. In the performance of that duty it may become necessary to canvass the vote in the manner pointed out by the statute.

The second part is that " the election law is void for want of uniformity in this: a different qualification is required of male citizens from what is required of females."

The provisions of the act aimed at by the above objections

F. M. Lyman v. Enoch F. Martin et al.

are found in the affidavit, which is required of persons before registration. The affidavit is as follows:

" I ——, being first duly sworn, depose and say, that I am over twenty-one years of age, and have resided in the Territory of Utah for six months, and in the precinct of ——— one month next preceding the date hereof, and (if a male) am a 'native born,' or 'naturalized,' (as the case may be) citizen of the United States, and a tax-payer in this Territory, (or if a female) I am 'native born,' or 'naturalized' or the 'wife,' 'widow,' or 'daughter,' (as the case may be) of a native born or naturalized citizen of the United States."

Upon the argument I understood that the only objection urged to the act was to the clause requiring that males should be taxpayers which qualification was not required of females. That there was a burden or qualification superimposed upon one class of citizens and not upon the other, and hence the whole act was void, and we are asked to declare it so. This we ought not to do, nor to declare any portion of it void, unless some plain provisions of the constitution or laws of Congress are violated.

Section 1860 of the United States Revised Statutes gives to the Legislative Assemblies of the Territories power to prescribe the qualifications of voters, subject, however, to certain restriction, among which are that they must be " citizens of the United States, over twenty-one years of age," and that " there shall be no denial of the elective franchise on account of race, color or previous condition of servitude."

The provision in question is not in violation of the above requirements, nor of any express provisions of the constitution or laws of the United States.

While the exercise of the elective franchise is a privilege rather than a right, yet all regulations upon that subject must be reasonable, uniform and impartial. Cooley's Const. Lim., p. 602.

Any provisions which should impose upon a particular class

of citizens, conditions and requirements not required of all others is void. Am. Law of Election, § 8.

This, the provision in question, does and is in violation of the above mentioned and well settled policy of the law, although not in conflict with any statute.

Is the whole act therefore void? We think not. It is well settled that one portion of a law may be valid and another portion invalid. And if one portion is invalid, the provision of that part may be disregarded, while full force and effect may be given to such as may not be void. *Bank* v. *Owens*, 2 Peters, 526; *People ex rel.* v. *Ball*, 46 N. Y. 69.

The above provision requiring that males should be "tax-payers" is the obnoxious portion. Striking out that as void, and the balance of the act is in no wise affected. There is nothing connected with this or dependent upon it to prevent this being done. Cooley's Const. Lim., p. 178.

But it is now claimed that there is a further objection to the act, which is covered by the point made; and that is, that the provision requiring a female to swear that she is the "wife," "widow," or "daughter" of a native born or naturalized citizen might permit persons not citizens to vote. As the "wife," or "widow" of a native born or naturalized citizen is a citizen, the objection must refer solely to such as are daughters of naturalized citizens. If I understand the reason for the objection, it is that a person may be the daughter of a naturalized citizen and yet not herself a citizen, as if her father was naturalized after the daughter arrived at the age of twenty-one years, and yet this act attempts to give to such the right to vote. I do not so understand its provisions.

It will be borne in mind that the act nowhere attempts to fix the qualifications of voters, that is fixed by other provisions of the statute not found in this act, and not altered, amended or repealed by it. The declared object of the act in question, as expressed by its title, is to provide for the registration of voters, and the manner of conducting elections; and in its very first section assumes that the qualification of voters is fixed

by some other statute, for it is there provided that the officers who are charged with the duty of registration shall " carefully inquire as to any and all persons entitled to vote," and " shall ascertain upon what ground such person claims to be a voter, and he shall require each person entitled to vote, and desiring to be registered, etc.," to take the oath above quoted; so that before they can take the oath and be registered they must be qualified voters, and to be voters they must be citizens. The fact of being registered does not of itself entitle a person to vote, his or her vote may still be challenged and refused for want of any of the necessary qualifications fixed by the statute. The provisions of this act does not affect the necessary qualification, and is not obnoxious to the objection made against it.

It is contended that the demurrer to the answer was improperly sustained for the reason:

"*First*—Because the alleged demand was denied, and a material issue of fact was thereby prevented."

The duty required of the defendants was a public duty, required of them as public officers. It is clearly and specifically pointed out by the statute, and being a public duty no demand was necessary upon their neglect to perform it before commencing proceedings to compel its performance. The law makes the demand, and they should have gone forward in the discharge of that duty without any special demand. It was not something the law required to be done on demand. It follows that the allegation that a demand was made was not necessary or material, and its denial raised no issue.

" *Second*—The answer alleged that the defendants passed upon the legality of the returns, and rejected them as void."

The proceeding by mandamus is uniformly declared by the courts to be " a civil remedy having all the qualities and attributes of a civil action," and our Practice Act, section 37, which provides that " all the form of pleadings in civil actions, and the rules by which the sufficiency of the pleadings shall be determined, shall be those prescribed in this act,"

refers to the pleadings in cases of mandamus, as well as to the pleadings in other civil actions. *Chamberlin* v. *Warburton*, 1 Utah, 257.

The sufficiency of the denials in the answer in the case at bar must then be determined by the same rules as in other civil actions. Construed by these rules, and in the light of the decisions under them, the answer is evasive and contains much that is mere statement of legal conclusions.

The allegation that the defendants then and there " fully passed upon the said return, and canvassed the force, effect and legality of said returns "　*　*　*　and "rejected the same as illegal and void and adjourned," is both evasive and the statement of legal conclusions. It is not the denial of any fact alleged in the affidavit. It is not only a statement of a legal conclusion, but is the exercise of a judicial function. The defendants had no judicial power; their duty was purely ministerial and extended only to the casting up of the returns and awarding the certificates to the proper persons. Am. Law of Elections, p. 64.

The several attempts at denial, and the allegations of the answer taken together, not only do not deny the facts set up in the affidavit, but lead to the conclusion that the appellants arbitrarily rejected the returns as an exercise of judicial rather than ministerial functions.

" When a ministerial officer leaves his proper sphere and attempts to exercise judicial functions, he is exceeding the limits of the law and guilty of usurpation.　*　*　*　To permit a mere ministerial officer arbitrarily to reject returns at his mere caprice or pleasure, is to infringe or destroy the right of parties, without notice or opportunity to be heard, a thing which the law abhors and prohibits." *State* v. *Sears*, 44 Mo. 223.

The denial in the answer that the ballot boxes " were then and there locked and securely sealed," or that the envelopes to be kept were in the possession of the clerk and securely sealed, is a mere statement that in their judgment they were not

securely sealed, without the statement of any facts from which that conclusion was drawn. It is an admission that they were in the possession of the clerk and were sealed, but in their judgment not securely. No issue was raised by the denial. Not only is there no material issue raised by the denials, but there is no new matter stated which constitutes a defense.

The answer seems to base the whole defense upon the invalidity of the act, although that question had been settled, so far as the proceeding were concerned in that case, in the court below, on the demurrer of the appellants to the writ. Not only so, but the statements in the answer in relation thereto were not sufficient to make it any defense. The assumed illegality of the act is not sufficiently set up to raise an issue. The facts from which the court might draw the inference that the act was void, and not the assumed inference, should have been stated. *People* v. *Supervisors*, 27 Cal. 655.

The answer not raising any question as to a matter of fact, the motion for a jury was properly overruled. In fact there was nothing for a jury to try. The trial of the issue of law raised by the demurrer completely disposed of the case, and there was a determination that there was no fact to try. C. L. § 1675.

The judgment of the court below is affirmed, with costs.

SCHAEFFER, C. J., concurs.

BOREMAN, J., delivered the following opinion, dissenting from the majority of the court:

The respondent applied to the district court for a mandamus to compel appellant, Martin, clerk of County Court of Tooele County, and the other appellants, as members of the said court, to examine and canvass election returns, and to declare who were elected. A demurrer to the affidavit (treated as a complaint) was overruled, and a demurrer to the answer was sustained. The appellants, electing to stand upon their answer, the court below granted the peremptory mandamus, and therefore appellants brought the case to this court.

The right to the mandamus must clearly appear. Under the former practice the alternative writ was regarded as the foundation of all subsequent proceedings in the case, and resembled in this respect the declaration in an ordinary action at common law. It was necessary that upon its face a clear right to the mandamus be shown, and the material facts on which the applicant relied be distinctly set forth, so that they may be admitted or traversed by the return. Great strictness is requisite in this respect. High's Ex. Leg. Rem. §§ 537, 538.

By tacit consent the affidavit has been treated as the complaint and the first pleading in this case. This is in accordance with the rule as laid down in California, and also recognized by this court in a former case. *People* v. *Supervisors*, 27 Cal. 665; *Chamberlin* v. *Warburton*, 1 Utah, 267.

The affidavit as a complaint, therefore, is to be treated as the alternative writ formerly was. It is a well settled rule that a demurrer reaches back to the first fault committed by either party; and on demurrer to the return or answer it is therefore competent for the defendant to avail himself of any material defect in the complaint or affidavit. *State* v. *McArthur*, 23 Wis. 427; Gould's Pl., ch. 9, § 36; 1 Nash's Pl. (4 ed.) p. 260; *People* v. *Booth*, 32 N. Y. 397; High's Ex. Rem. § 493.

And if the answer be obnoxious to a demurrer, yet if the complaint is defective in substance judgment is properly given for defendant. High's Ex. Rem. § 493.

When, therefore, the demurrer in this case is interposed to the answer, this demurrer reaches back to the complaint or affidavit, and it is claimed that the affidavit is defective in substance.

*First*—The complaint (the affidavit) does not allege or show that it was the duty of the appellants to do the various things which it is asked that they be compelled to do. The simple allegation that the appellants, after demand, refused to do certain things " as required by law," is not sufficient. What law is referred to? Some statute of the United States or of the Ter-

ritories, or does it refer to the common law? The allegation should be definite, and the law should be designated; and I do not think that a simple designation even of the law would be sufficient, unless sufficient was alleged aside from this to sustain the relator's case. High's Ex. Rem. §§ 536–538.

The affidavit should have contained all of the facts which go to constitute the duty and which induce the obligation on the part of the defendant to perform the act sought to be performed. High's Ex. Rem. § 536.

In this case, now before us, the affidavit contains none of the facts going to show that it is the duty of appellants to do the things which they are now asking the court to compel them to do. It does not even refer to any statute, and it cannot be claimed that the mandamus should be granted in anticipation of a supposed omission of duty; an actual omission of duty must be shown. High's Ex. Rem. § 12, and cases cited there; *Ibid.* §§ 39–41. For this failure, therefore, the ground for a mandamus does not appear.

*Second*—But if it be assumed that enough is alleged as to the duty of the appellants in the premises, by the simple recital " as required by law," and that "law" refers to " an act providing for the registration of voters," etc., approved 22nd February, 1878; we then must consider whether that be a valid law, as that is one of the points raised and pressed in this case.

The registration act referred to, provides that the assessor " shall ascertain upon what ground such person claims to be a voter, and he shall require each person entitled to vote and desiring to be registered, to take and subscribe in substance the following oath or affirmation:

TERRITORY OF UTAH, } ss.
   County of ——— }

I ———, being first duly sworn, depose and say that I am over twenty-one years of age, and have resided in the Territory of Utah for six months, and in the precinct of ———, one month next preceding the date hereof, and (if a male) am a " native," or "naturalized " (as the case may be) citizen of the

United States, and a taxpayer in this Territory; (or if a female) am "native born," or "naturalized," or the "wife," "widow," or "daughter" (as the case may be) of a native born or naturalized citizen of the United States; and the same section further provides that "upon the receipt of such affidavit the assessor, as aforesaid, shall place the name of such voter upon the registration list of the voters of the county." § 1.

This statute requires that each person entitled to vote and desiring to be registered shall take this oath. If his or her name be not upon the registry list, his or her "ballot shall be rejected." (§ 13.) It avails a party nothing that he is "entitled to vote," he will not be allowed to vote unless he be registered, and will not be allowed to register unless he takes that oath. His right, and the right of every citizen, to be registered and to vote, depends upon his taking that oath. Every part of that registration act is pivoted on the oath; if the oath falls then the whole registration act falls, for there is no provision made for any registration that does not depend upon that oath.

The question then for consideration is whether the oath be valid or not.

Our "Organic Act"—our Charter—provides that citizens alone can vote (§ 5 of the Organic Act). If this provision has since been modified by United States statute (U. S. Rev. Stat. § 1860,) giving the legislature power to allow aliens to vote upon declaring their intentions to become citizens, the principle is not changed in regard to the oath; for our legislature has not availed itself of this modification, and has never passed any act allowing aliens to vote upon "declaring their intentions" to become citizens.

The legislature can have no power to do that which the laws of Congress say the legislature shall not do. There might be sometime a disagreement as to what the legislature might do when the matter was not by law of Congress forbidden, but there can be no possible disagreement when the power is in express words denied to the legislature. The law of Congress is our constitution in the matter.

The Revised Statutes of the United States (§ 1860) provides that the legislatures of the Territories may fix the qualifications of voters, " subject, nevertheless, to the following restrictions upon the power of the legislative assemblies, namely," etc., and the first restriction is that the right of suffrage shall be confined to citizens, and those who have declared their intention to become such. This is, in effect, a constitutional prohibition upon the legislature, and if the legislature attempts to extend the right of suffrage beyond these named limits, their action is nugatory. The legislature, as I have said, have not availed themselves of the power to extend he right of suffrage to " those who have declared their intention to become citizens. Therefore, no person, male or female, can vote in this Territory unless such person be a citizen. The conclusion is, to my mind, irresistible, and I can see no possible way to avoid it.

The Territorial statute prescribing the qualifications of voters, uses language to which that of the oath in the registration law exactly corresponds. The assessor, then, in ascertaining who are " entitled to vote " looks to the statute; and the language of the statute and that of the registration oath being the same, it follows that the persons possessing the qualifications specified in the oath, and who will take the oath, will be allowed to register and to vote.

The oath excludes all male persons from voting who are not " native born " or " naturalized," yet it allows female persons to register and vote who are neither "native born " nor " naturalized." The evident intention was to evade or ignore the law of Congress. If this were not the purpose why not stop with the words " native born or naturalized," when referring to female persons, as was done when the language referred to male persons?

The daughter of a naturalized citizen is not made a citizen by her father's naturalization, any more than a son, unless she was under twenty-one years of age at the time of her father's naturalization, and yet this Territorial statute and oath allows

her to be registered and to vote. She has no more right to that privilege than a son, and the legislature had no authority to grant it to either. This cannot be deemed an unimportant matter, when we remember that two-thirds, or nearly so, of the population of this Territory, according to the last census, were of foreign birth or the children of parents who were of foreign birth.

This act, without any restrictions or limitations, allows the wives of citizens to vote, yet all wives of citizens are not citizens.

The Revised Statutes of the United States (§ 1994) says: "Any woman who is now or may hereafter be married to a citizen of the United States, and who might herself be lawfully naturalized, shall be deemed a citizen." Could a woman who has been a resident of this country less than five years be "lawfully naturalized"? If not, then the fact of her being a wife will not make her a citizen. I am not unmindful of the limitation made in *Kelly* v. *Owen*, 7 Wall. 496, whereby the restrictive clause in the last section referred to, as it then stood, only limited the application to free white women. In that case the limitation hung upon the words "under existing laws," and these words have been left out of the later statute; and, not only so, but the limitation has also been expressly negatived by § 2169 of the United States Revised Statutes, which provides that the naturalization law shall apply to persons of African birth or descent. If the hook upon which the court in that case hung its exception or qualification, has been stricken out and also expressly negatived by statute, and yet the clause, shorn of these qualifying words, "under existing laws," be allowed to stand and be embodied in the revision of the laws, we must conclude that there was some other matter sought to be reached, other than that of the applicant being a free white woman. In the case referred to (*Kelly* v. *Owen*) the parties to the action had all been residents of this country five years, and hence no question on that point did or could arise. The ruling there simply resolves itself into this, that

all of the parties being of five years' residence, then and in that case the only restriction was that of color. An examination of the decision will fully bear out this view.

In the case of *Minor* v. *Happersett*, 21 Wall. 162, the Supreme Court of the United States dwell at considerable length upon the subject of native born women being citizens, and refers to the fact that the Government has also made provision for alien women to become citizens; it refers to the same section as above given to show this, and there is nothing whatever in the opinion in that case not in harmony with the view I have given of the section.

The conclusion, to my mind, is that no married woman of foreign birth can be allowed to vote in this Territory by reason of such marriage tie, until she has been a resident of this country for five years, the time required for the naturalization of males, otherwise the law would not be uniform and would be unjust and inequitable, and in violation of the United States statutes—our constitution in such cases. Congress never contemplated such inequality.

The registration act referred to allows " widows " of citizens to vote, when all widows are not citizens for the same reason that all " wives " cannot be such. As to the citizenship itself of widows there is this exception, that if their husbands had declared their intention to become citizens, then the widow would be a citizen " upon taking the oaths prescribed by law." (Rev. Stat. of U. S., § 2168.) But this exception does not apply here, for the reason that a " widow " does not have to swear that she is a citizen, nor show that she has taken the " prescribed oath."

The registration oath not only allows " wives," " widows " and " daughters " to vote who are not citizens; but it, on the other hand, excludes men from voting who are citizens. A male person of foreign birth who when his father was naturalized was under twenty-one years of age, is by the act excluded from voting unless he be naturalized himself. It requires all male persons to be native born or naturalized in order to vote,

notwithstanding it allows female persons to vote without being either naturalized or native born.

The Territorial act not only confines the male voters to those who are native born or naturalized, but it also imposes an additional burden upon them that is not imposed upon the female voters. The male voters are required to be taxpayers. Such a discrimination is unjust and unreasonable. The court, in the majority opinion, so holds, but says the oath is nugatory only to that extent. The court, as I think, has no authority for doing this. It is not an analagous instance to that of a statute which contains various grants not dependent upon each other, part of which might be stricken out and the residue stand, and in the giving of those stricken out the legislature had transcended its authority. But it might be more analagous to a grant based upon several conditions, all of which are to be complied with before the grant accrues. Here several things have to be sworn to before the party applying will be allowed to register and vote, and there is no authority to register such person if any one of those things specified are left out. Therefore, if he cannot swear to every one of the matters required by the oath, he is excluded from registration and voting. His right to vote being based upon an oath of specific provisions, the court cannot say that he can be registered and vote by taking part of that oath. The oath as given and as a whole must be taken. If one of its provisions falls, that which remains is not the oath required for registration; and any attempt by the court to change the oath and authorize a different one is, in my judgment, simply legislating.

But as I have, I think, shown the oath in question is not defective in merely one particular; there are defects in almost every branch of it—defects that are incurable by this or any other court. The branch applying to "wives" is thus defective; also that applying to "widows"; also that applying to "daughters," and that applying to male persons.

A registration act founded upon an oath so bristling with

unjust discriminations ought not to stand. An election carried on under it is a fraud upon the rights of the people.

One able text writer says that "all regulations of the elective franchise must be reasonable, uniform and impartial." (Cooley's Const. Lim. p. 620.) A statute that is not so is utterly void. *Munroe* v. *Collins*, 17 Ohio St. R. 665.

The statutes of the United States stand as our constitution in this matter. The oath and registration act being in direct violation of the Statutes of the United States, are unconstitutional, null and void. They are not only void for the reason stated, but also because they are against the plain and obvious principles of common right and common reason. Whenever any law is calculated to operate against these principles it is null and void. *Wilkinson* v. *Leland*, 2 Peters, 657; *Terrett* v. *Taylor*, 9 Cranch. 43; Cooley's Const. Lim. p. 166, note 1.

That this oath is against common right and common reason is manifest to every one.

There are two or three minor points upon which I am unable to unite with the majority of the court, but it is not necessary to note them.