MARY J. COGGESHALL, RUBY J. ECKERSON, LONA I. ROBINSON and ANNA R. LOWERY, Appellants, v. CITY OF DES MOINES ET AL., Appellees, ELI ROGERS and THOMAS TOBIN, Interveners.

**Municipal elections:** INCREASE OF INDEBTEDNESS: STATUTES: RIGHT OF WOMEN TO VOTE. Sections 1 to 4 inclusive of chapter 34, Acts 32d General Assembly, with reference to the purchase of ground and erection of city halls in cities of more than 50,000 population, do not confer separate powers, but are interdependent and were enacted with the single purpose of authorizing such cities to erect city halls by the levy of a special tax, or the issuance of bonds for that purpose; and upon a proposition submitted to the popular vote involving the question of increasing the municipal indebtedness by either method for that purpose, women, having the other qualifications, are by the provisions of Code, section 1131, entitled to vote.

**Elections:** CONSTITUTIONAL QUALIFICATION OF VOTERS: LEGISLATIVE MODIFICATION. Article 2, section 1, of the constitution prescribes the qualification of voters at municipal elections, as the term is used in the constitution, and the legislature has no power to add to or subtract from such qualifications.

**Same.** Article 2, section 1 of the constitution has reference to the qualification of voters at the elections for the choice of officers only, so that Code, section 1131, authorizing women to vote on questions of municipal indebtedness in cities of 50,000 population, is not in violation of that constitutional provision.

**Class legislation:** EXEMPTION OF WOMEN FROM REGISTRATION. The

fact that the statute does not require women to register the same as men, as a prerequisite of the right to vote on the question of municipal indebtedness in cities of 50,000 population, is not such an unreasonable classification as to violate the constitutional provision prohibiting class legislation.

Elections: DENIAL OF RIGHT OF WOMEN TO VOTE: EFFECT. Where the refusal of women to vote on the question of municipal indebtedness was not based on the disqualification of the particular individuals offering to vote, but objection was directed against them as members of a class, and it appeared that there were enough qualified voters of that class in the city to have changed the result, the refusal of the votes offered invalidated the election, although the reception of the same would not have changed the result.

*Appeal from Polk District Court.*— HON. HUGH BRENNAN, Judge.

TUESDAY, JULY 7, 1908.

UPON hearing the petition was dismissed. The plaintiff's appeal.— *Reversed.*

*Grace H. Ballantyne* and *Wm. H. Baily,* for appellants.

*W. H. Bremner* and *W. L. Read,* for appellees.

*Bowen & Brockett,* for interveners.

LADD, C. J.— The council of the city of Des Moines, in pursuance of the authority conferred by chapter 34, Acts 32d General Assembly, caused to be submitted at an election called for that purpose the question: " Shall the city of Des Moines erect a city hall at a cost, not exceeding $350,000 ? " No provision whatever was made by the officers of the city for the casting or receiving the ballots of women, and when two of the plaintiffs and another appeared at the proper polls they were refused ballots and denied the right to vote. The

result of the election was a majority of seven hundred and twenty-nine votes in the affirmative. The council thereupon procured plans and specifications for a building, purchased a site, directed the board of public works to contract with a firm of architects to superintend the construction, levied taxes, and intended to issue and sell bonds to raise funds to pay the contract price. The demand of plaintiffs that further action by the council be enjoined is based on the alleged denial of the right of women to vote at the election. This is met by the defendants, contending: (1) That the question submitted was not one upon which the statute authorizes women to vote; (2) that the statute authorizing women to vote on certain specified subjects is inimical to section 1 of article 2 and section 6 of article 1 of the Constitution; (3) that the statute, or a part of it, has been repealed by subsequent legislation; and (4) that, even if some women were refused the right to vote, the election was not invalidatd thereby.

The privilege of voting is limited to males in this State, save on certain questions clearly pointed out in section 1131 of the Code, which reads: "At all elections where women 1. MUNICIPAL may vote, no registration of women shall be ELECTIONS: increase of required; separate ballots shall be furnished indebtedness: statutes: right for the question on which they are entitled to of women to vote. vote; a separate ballot box shall be provided in which all ballots cast by them shall be deposited, and a separate canvass thereof made by the judges of the election, and the returns thereof shall show such vote. The right of any citizen to vote at any city, town or school election, on the question of issuing any bonds for municipal or school purposes, and for the purpose of borrowing money, or on the question of increasing the tax levy, shall not be denied or abridged on account of sex." This was a city election, and as we think the vote was both on the question of issuing bonds and on the question of increasing the tax levy. The vote of the people never operates as a levy nor the execution of bonds. It merely empowers the proper officers to do

these things, and this may be accomplished by a direct expression on the issuance of bonds or increase of taxation, or indirectly by instructing the officers to make improvements or erect buildings which necessarily have this effect. Statutes in this State are to be liberally construed, to the end that the object had in their enactment be effectuated, and from a reading of this section the intention to allow women to participate in local elections directly involving the expenditure of large sums in improvements is manifest. It is immaterial whether the question specify the precise amount of bonds to be issued or tax levied, or authorize the construction of an improvement involving the raising of money in one or both of these methods with which to pay the cost. The consequence of the election is the same in either event. What practical difference is there between voting a tax to be levied at so many mills a year until $350,000 is raised, or the issuance of that amount in bonds, the proceeds to be paid for the cost of a building and voting for the erection of a building at that cost, thereby authorizing the expenditure of that amount to be raised by the city in one or both these methods? In either event the question of the issuance of bonds or increase of taxation is directly involved, and on that the voice of the women can no longer be silenced in this State, save by the repeal of this statute. If, then, the question submitted to the voters involved the issuance of bonds or increase of taxation, women having other qualifications requisite should have been provided with ballots at the special election. Chapter 34 of the Acts of the 32d General Assembly, except the last section, which relates to the procedure of submitting the question, is as follows:

Sec. 1. Cities having a population of fifty (50) thousand or over shall have the power to erect a city hall and to purchase the ground therefor.

Sec. 2. For the purpose of paying for the construction of such building and the purchase price of such ground, such cities shall have the power to levy upon all the property

within the corporate limits of such cities and towns subject to taxation for said purposes in addition to all other taxes now provided by law, a special tax not exceeding in any one year two mills on the dollar for a period of years not exceeding twenty.

Sec. 3. Any city desiring to construct such a building or to purchase ground therefor may issue bonds in anticipation of the special tax authorized in the preceding section. Such bonds shall be known as city hall bonds and shall be issued and sold in accordance with the provisions of chapter 12 of title 5 of the Code of Iowa, and acts amendatory thereto. In issuing such bonds, the city council may cause portions of said bonds to become due at different, definite periods, but none of such bonds so issued shall be due and payable in less than five (5) or more than twenty (20) years from date.

Sec. 4. No building shall be erected under the provisions of this act unless a majority of the legal voters voting thereon vote in favor of the same at a general city election or at a special election.

The design of the Legislature was to enable a city of the population stated to acquire a building commensurate with its needs in which to transact the business incident to so large a corporation. The several sections are to be construed as having been enacted to accomplish this object. To this end the council is given plenary power in the selection and purchase of a suitable site and may levy taxes or issue bonds for its payment; but, before any building may be erected thereon, the approval of a majority of the " voters, voting thereon," is essential. It matters not whether we denominate this a limitation on the first section or the source of authority to build; the power cannot be exercised without the approval of the voters. Nor do we think that prior to such approval the council have any authority to levy taxes or issue bonds to meet the cost of the erection of the hall. These are authorized only " for the purpose of paying for the construction of such building." Surely the council may not lawfully raise funds to pay for something for which it is forbidden to expend the money. If, as appellees contend, sec-

tion 4 of the act merely prevents the council from proceeding with the erection without the sanction of the voters, but does not interfere with raising of funds, then the council might anticipate the uncertain outcome of an election, or even the uncertainty of it being called, and load the people with the burden of debt without prospect of the expenditure of the money raised in the construction of the building. Funds might be accumulated in unlimited amounts from the levying of taxes, or sale of bonds in anticipation that at some time indefinitely in the future the council might conclude to call an election and the voters authorize the construction of a hall. Manifestly such was not the design of the Legislature, for this would authorize the council to fix upon the cost of the structure, whereas, by the language of the question to be submitted, that is to be determined by the voters. Of course, the sole object of the courts in construing acts of the Legislature is to ascertain the intent with which enacted. To arrive at this the several sections of an act are to be considered as parts of a connected whole and harmonized if possible so as to aid in giving effect to the intention of the lawmakers. *District Tp. of Dubuque v. City of Dubuque,* 7 Iowa, 262; *Minneapolis & St. Louis R. Co. v. Cedar Rapids, G. & N. W. R. Co.,* 114 Iowa, 502; *Goerdt v. Trumm,* 118 Iowa, 210; *State v. Forkner,* 94 Iowa, 733.

These different sections are interdependent, and were enacted with a view to the accomplishment of a single object, and none of the accepted canons of construction lend support to the contention of appellees that each of the first three should be held to confer separate powers each independent of the other; only the first being limited by the fourth. We are of the opinion that they should be construed together, and that an affirmative vote by a majority of those voting is essential as a condition precedent to the levying of the special tax or issuance of bonds for the payment of the building. Possibly, as suggested, a city hall might be erected from the general funds of the city, a point we do not decide, because

not material. It is enough that the question submitted involved the granting of power to the council of the city of Des Moines to make a special tax levy or to issue bonds, and that is the only matter ever determined by the voters of an election called to pass on such a question. As said before, the majority vote does not operate as a levy or the execution of the bonds; it merely confers upon the proper officers the authority to do so, and it is immaterial, so far as this case is concerned, whether such authority was mandatory or discretionary. The question submitted involved that of issuing bonds and increasing taxation, and therefore, under the plain provisions of section 1131, qualified females were entitled to vote thereon.

The case of *Youngerman v. Murphy,* 107 Iowa, 686, seems to have been relied on by appellees, but it is not in point. There the city was expressly authorized to levy and collect taxes with which to create a sinking fund, and to deposit the same in the banks at interest with a view of subsequently purchasing waterworks or of erecting the same. The contract of purchase or for the creation of the works alone was to be submitted to the electors for approval, and the court held that, as the tax was for a specific purpose, it might be levied as the statute directed prior to such approval. Here there is no provision for raising a sinking fund or the deposit of that raised in banks, nor authority to levy a tax or issue bonds prior to an affirmative vote of the people.

II. Appellees contend that the Legislature was without power to confer upon women the privilege of voting on any subject, and rely on section 1 of article 2 of the Constitution as prescribing the qualification of voters at all elections. That section provides that: " Every male citizen of the United States of the age of twenty-one years, who shall have been a resident of this State six months next preceding the election, and of the county in which he claims his vote, sixty days, shall be entitled to vote at all elections which are now

2. ELECTIONS: constitutional qualification of voter: legislative modification.

or may hereafter be authorized by law." The right to vote
is not a natural or inherent right, but exists only as con-
ferred by the Constitution of the State or some statute.
*Gougar v. Timber Lake,* 148 Ind. 38 (46 N. E. 339, 37 L.
R. A. 644, 62 Am. St. Rep. 487). Ours is a representative
government, wherein only a limited number express the will
of all the people, and the Constitution having declared, by
prescribing definite qualifications, the persons who shall rep-
resent the interests of all at the polls, it is not competent for
the Legislature to add to or subtract from the qualifications
as determined by the fundamental law at any election therein
contemplated. *Quinn v. State,* 35 Ind. 485 (9 Am. Rep.
754); *Feibleman v. State,* 98 Ind. 516; *Rison v. Farr,* 24
Ark. 161 (87 Am. Dec. 52); *McCafferty v. Guyer,* 59 Pa.
109; *Davies v. McKeeby,* 5 Nev. 369; *People v. Canaday,*
73 N. C. 198 (21 Am. Rep. 465). See *Morrison v. Springer,*
15 Iowa, 304; *Edmonds v. Banbury,* 28 Iowa, 267. "When-
ever the Constitution has prescribed the qualifications of
electors, they cannot be changed or added to by the Legisla-
ture or otherwise than by an amendment to the Constitution."
Cooley's Constitutional Limitations, section 599. The right
of suffrage is a political right of the highest dignity, abiding
at the fountain of governmental power, and is for the con-
sideration of the people in their capacity as creators of the
Constitution, save as that instrument may authorize a regu-
lation of its mode of exercise. *Morris v. Powell,* 125 Ind.
281 (25 N. E. 221, 9 L. R. A. 326); *People v. English,* 139
IIll. 622 (29 N. E. 678, 15 L. R. A. 131); *Coffin v. Thomp-
son,* 97 Mich. 188 (56 N. W. 567, 21 L. R. A. 662). The
doctrine that, as the Constitution of the State is a limitation
of power, the Legislature may enact laws not prohibited, has
no application, for, the section quoted having designated the
precise qualifications of electors, it thereby determines who
shall exercise the privilege of voting, and necessarily pro-
hibits others or ·disqualifying those so endowed with that
privilege. The decisions are so uniform on these proposi-

tions that only a few have been cited.  In a number of cases similar constitutional qualifications have been held not to be essential in elections not contemplated in the Constitution itself.  See *Hanna v. Young,* 84 Md. 179 (35 Atl. 674, 34 L. R. A. 55, 57 Am. St. Rep. 396); *Plummer v. Yost,* 144 Ill. 68 (33 N. E. 191, 19 L. R. A. 110); *Belles v. Burr,* 76 Mich. 1 (43 N. W. 24); *Wheeler v. Brady,* 15 Kan. 26; *State v. Cone,* 86 Wis. 498 (57 N. W. 50).  But these decisions are not controlling, for that the qualifications prescribed in this State are not only for " all elections which are now," but for all which " may hereafter be authorized by law." Clearly this has reference to such elections as the General Assembly, in the exigencies of the future, may deem advisable, and, whether such elections are local or general, sex is made an essential qualification of the elector.  The language is so plain that discussion cannot elucidate.  As bearing thereon, see *State ex rel. Allison v. Blake,* 57 N. J. Law, 6 (29 Atl. 417, 25 L. R. A. 480); *People v. Canaday,* 73 N. C. 198 (21 Am. Rep. 465); *In re Gage,* 141 N. Y. 112 (35 N. E. 1094, 25 L. R. A. 781).  See *Edmonds v. Banbury,* 28 Iowa, 267.

True, as contended by appellants, the only elections referred to in the Constitution are those of the State, district, county, and township; but this does not preclude other elections from being authorized by law.  For this reason decisions relied on by appellants are not in point.  Thus in *State v. Dillon,* 32 Fla. 545 (14 South. 383, 22 L. R. A. 124), the qualifications prescribed were for " all elections under this Constitution," and as the instrument contained no reference to elections in municipal corporations, though the former Constitution had done so, it was held that the Legislature might fix the qualifications of electors at municipal elections.  See, also, *Harris v. Burr,* 32 Ore. 348 (52 Pac. 17, 39 L. R. A. 768).  In some of the cases, provisions for the establishment of a school system are given great weight but in none has an act of the Legislature modifying the qual-

ifications of an elector at an election of an officer been upheld where those found in the Constitution are made applicable to all elections of officers authorized by law. No option is left to the courts, save to enforce the mandate of the Constitution according to its plain language and intent. It may be that a municipality is the creature of the Legislature (*Dubuque v. Railway,* 39 Iowa, 56) ; but not of unlimited control, save in so far as it performs functions as the agent of the State (*State v. Barker,* 116 Iowa, 96). It is a subdivision of the State and recognized in the Constitution in the limitation of indebtedness which may be incurred thereby and the prohibition of special laws for the incorporation of cities and towns. Sections 30, article 3 ; section 3, article 11. Conceding the Legislature plenary powers in the matter of organizing municipal corporations, yet, if it provides for the election of officers therein, there is no escape from accepting the electorate as defined by the Constitution.

III. But, as contended by appellant, the word " elections," as used in the Constitution, has been construed to have reference to the choice of officers alone. *Seaman v. Baughman,* 82 Iowa, 217. And this definition is in harmony with the authorities generally. Thus, in *Callam v. City of Saginaw,* 50 Mich. 7 (14 N. W. 676), an act authorizing the defendant city to construct the county courthouse on condition that a majority of the taxpayers so voted was approved, though such qualification was not specified in the Constitution. In *Mayor, etc., of Town of Valverde v. Shattuck,* 19 Colo. 104 (34 Pac. 947, 41 Am. St. Rep. 208), property qualification of electors voting to dissolve the town and annex to Denver was held valid, though such qualification was not one of those prescribed in the Constitution; the court saying: " In our opinion the word ' elections ' thus used (in the Constitution) does not have its general or comprehensive signification, including all acts of voting choice or selection, without limitation, but is used in a more restricted sense as elections of

public officers." See, also, *Thornton v. Territory of Washington,* 3 Wash. T. 482 (17 Pac. 896); *Woodley v. Town Council of Clio,* 44 S. C. 374 (22 S. E. 410); *Menton v. Cook,* 147 Mich. 540 (111 N. W. 94). Until comparatively recent times, the word "election," when applied to political subjects, did not denote the choice of a principle, or the decision of a question of government, or the advice to governing bodies by the electors, and only when declared by the instrument itself to be sufficiently comprehensive to cover these matters has it been construed to have this extended meaning. See *Com. v. Steele,* 97 Ky. 27 (29 S. W. 855). A vote on a question like that submitted is advisory only. Even though a majority of the voters voting answer it in the affirmative, the council is not bound to act thereon, though it be a condition precedent to their power to act. It is but the participation by persons authorized in a subdivision of the State in the exercise of legislative power, and, though involving choice and discrimination, cannot, in any proper sense, be regarded as voting at an election such as contemplated by the Constitution in defining the qualifications of those entitled to the ballot. *Eckerson v. City of Des Moines,* 137 Iowa, 452.

IV. It will be observed that section 1131, already set out, requires separate ballots, ballot boxes, canvass, and returns, and provides that "no registration of women shall be required." No point is made with respect to the separation because of sex, as this could not be said to involve any discrimination; but it is urged the exemption from registration, when male voters are required to register, is violative of the provision of the Constitution that "all laws of a general nature shall have a uniform operation; the General Assembly shall not grant to any citizen or class of citizens privileges or immunities, which upon the same terms shall not equally belong to all citizens." That the statute grants an immunity which is not accorded the male voters is apparent, and our only inquiry is whether this is done on the same terms; that is,

4. CLASS LEGISLA-
TION: exemp-
tion of women
from registra-
tion.

whether the classification is reasonable. Without reviewing
the authorities as to what is essential to the validity of legis-
lative classification, it may be said in a general way that
such classification must be based upon apparent natural re-
sons as opposed to those which are purely arbitrary, such as
are suggested by necessity, by difference in the situation and
circumstances of the subjects indicating the necessity or pro-
priety of different classification for different legislation con-
cerning them. All are to be treated alike who, under the
same conditions, are brought within the influence of the law,
and also the law in its classification must bring within its
influence all under the same conditions. *State v. Garbroski,*
111 Iowa, 496; *Wooster v. Bateman,* 126 Iowa, 552; *Shaw
v. City Council of Marshalltown,* 131 Iowa, 128; *McGuire
v. Railway,* 131 Iowa, 340. That an arbitrary classification
of voters will not be tolerated may be conceded, and it is
doubtful whether any substantial discrimination between
electors with full suffrage may be upheld. See *Attorney-
General v. Detroit,* 78 Mich. 545 (44 N. W. 388, 7 L. R. A.
99, 18 Am. St. Rep. 458); *Lyman v. Martin,* 2 Utah, 145;
*Morris v. Powell,* 125 Ind. 281 (25 N. E. 221, 9 L. R. A.
326). The matter of sex, but for the Constitution and laws,
might not alone furnish a basis of discrimination, for such
difference alone can have little or no bearing on the necessity
for requirements in proving the right to vote. But the fact
that female suffrage is limited, and women are allowed to
vote only on questions involving the issuance of bonds, bor-
rowing money, and increase of taxation when submitted to
the people, and never at " elections" as that term is used in
the Constitution, while the male voters may cast their ballots
on all questions and at elections, furnishes a sufficient dis-
tinction to justify a classification such as made. Indeed,
the Constitution itself, by allowing males alone to vote at
the elections of officers, has created the classification appel-
lees contend is inconsistent with its provisions. The Leg-
islature might well have concluded that, owing to the limited

exercise of suffrage, the nature of the questions voted on, as well as the infrequency of the submission thereof to the voters, women ought not to be required to go to the trouble nor the municipality to the expense of registration, and we are of opinion that the Constitution by its discrimination between the sexes in favor of men furnished a reasonable basis for this discrimination in favor of women in this legislation. It follows that plaintiffs were entitled to vote on the question submitted at a special election June 20, 1907, and were illegally deprived of that privilege.

V.   Had the election officers gone no farther than refuse the votes of the women which were actually tendered, the result could not be disturbed, for in that event enough were not rejected to have changed the result. But the refusal was not based upon disqualification peculiar to the individuals, but as members of a class.   The evidence shows conclusively that the denial was directed to all women as such, and for this reason the election cannot be sustained as valid.   The city clerk, whose duty it was to provide separate ballots and ballot boxes for each voting precinct, though demanded by the representatives of the Political Equality Club of one hundred and fifty women, refused, and none were furnished or to be found at the voting booths.   To Grace H. Ballantyne, as attorney for this club, the city solicitor said that in his opinion women were not entitled to vote, and that no provision would be made for them.   Such evidence was admissible in connection with proof that the city officers acted on such advice as tending to show the denial of the privilege of voting to women generally.   All this was reported to the members of this club and to representatives of the Federation of Woman's Clubs, composed of about twelve hundred members. The city clerk and the judges of election of at least three precincts acted on the advice of the city solicitor, and the daily press of the city discussed in a manner to give widest publicity the fact that women would not be permitted to vote

5. ELECTIONS: denial of right of women to vote: effect.

on the question submitted.   From the omission of the officer, whose duty it was to see to it that facilities for voting were furnished, to provide separate ballots and ballot boxes for the female voters on the advice of the city solicitor, together with proof that the judges at their voting precinct and voting booths were not supplied therewith and declined to receive votes on the advice of the solicitor, it is to be inferred that the ballots of the women of the city generally would have been refused had they tendered them.   The result was that a large class of voters, many times the majority mentioned, was denied the right of suffrage.   The distinction must be kept in mind between depriving an individual of the ballot because of some disqualification peculiar to himself and the denial thereof to an entire class of voters.   In the former, when not fraudulently done, but through error in judgment, there is no remedy.   Cooley's Constitutional Limitations, section 781; *State v. Hanson,* 87 Wis. 177 (58 N. W. 237, 41 Am. St. Rep. 38).   But it is not so where a body of voters is denied the privilege as a class when numerous enough to have changed the result.   The denial is then in the nature of oppression and operates to defeat the very purpose of the election; that is, of ascertaining the choice or sentiment of the electorate.   Thus, excluding enough voters, on account of color, to change the result had they voted one way, has been held to render an election void.   *Howell v. Pate,* 119 Ga. 537 (46 S. E. 667).   Says Mr. McCrary, in his work on Elections (section 235):

It sometimes happens that the officers of election, though acting in good faith, commit errors which will vitiate the election.   Thus, if they have adopted an erroneous rule in regard to the qualification of electors, by which legal votes were excluded, or illegal votes admitted, in numbers sufficient to change or render doubtful the result, the election is void, unless there is proof upon which the poll can be purged of illegal votes and the true result shown.   And in such case if the erroneous rule affects a class of voters, and it has become generally known to the persons excluded

by it, they may submit to it, without waiving any rights, although they do not present themselves at the polls and offer their ballots. They have the right to take notice of the decision of the board in other cases precisely like their own. To require each voter belonging to a class of excluded voters to go through the form of presenting his ballot, and having a separate ruling in each case, would be an idle and useless formality. We are to look at the substance, and not the formality.

The same thought is expressed in section 276 of this work. A like rule seems to obtain when no opportunity is afforded those entitled to cast ballots in sufficient number to affect the result either owing to the polls not being opened in some precincts of the district, an insufficient number of ballots being supplied, or the rejection as invalid the vote of entire precincts of a district or county. *People v. Salomon*, 46 Ill. 415; *Maloney v. Collier*, 112 Tenn. 78 (83 S. W. 667); *Hocker v. Pendleton*, 100 Ky. 726 (39 S. W. 250); *People v. Canaday*, 73 N. C. 198 (21 Am. Rep. 465); *Marshall v. Kerns*, 2 Swan (Tenn.) 68; *Barry v. Lauck*, 5 Cold. (Tenn.) 588; *Burrough v. Hackney*, 31 L. T. N. S. 69.

According to the last State census, there were 19,179 native born women above twenty-one years of age residing in Des Moines, or 741 more than there were men of like age, and no time need be wasted in deducing from this proof that more qualified female voters than were necessary to overcome the majority resided in the city June 20, 1907, the day of the election. In view of the fair inference that probably more than half of those entitled to vote were denied the privilege, no consideration need be given the suggestion that but slight injury resulted from the deprivation of this important right. The suggestion that so much of section 1131 as allows women to vote without registration has been repealed is disposed of by what has been said. We reach the conclusion that the election was invalid, and that defendants

should have been permanently enjoined from proceeding thereunder.— *Reversed*.