Argued January 5; decided February 14, 1898.

## HARRIS v. BURR.

[39 L. R. A. 768, 52 Pac. 17.]

CONSTITUTIONALITY OF FEMALE SUFFRAGE AT SCHOOL ELECTIONS.—The elective franchise conferred by the Oregon constitution, article II, section 2, determines the qualification of voters at all general elections provided for by the constitution, except such as have been or may be provided for under the power conferred on the legislature by the constitution, article VIII, section 3, to provide a system of common schools. Under this power the legislature has plenary power to determine who shall vote at school elections, and a provision that women may vote is constitutional.

From Lane: J. C. FULLERTON, Judge.

Action by Laura A. Harris against Sherwood Burr and others, judges of election, for damages for having been denied the privilege of voting at an election for school director. Plaintiff claimed under a statute which conferred the right to vote at school elections on "any citizen of this state  *  *  *  who is .21 years of age and has resided," etc., asserting that any qualification for school electors established by the legislature is constitutional under the provisions of article VIII, section 3, that "The legislative assembly shall provide by law for  *  *  *  a system of common schools." Defendants insist that the only qualification for voters in this state is found in article II, section 2, of the constitution, viz: "In all elections not otherwise provided for by this constitution every white male citizen of the United States, of the age of 21 years,  *  *  *  shall be entitled to vote at all elections authorized by law." The trial court sustained the contention of plaintiff, and the jury as-

sessed her damages at $50, whereupon the defendants appealed.

AFFIRMED.

For appellants there was an oral argument by *Mr. E. R. Skipworth*, with a brief to this effect.

If plaintiff was not a "legal voter," she could not sustain damages, in contemplation of law, by the refusal of the judges of the election to receive and count her ballot.

Participation in the elective franchise is not a natural right, but a privilege conferred by law: Cooley on Constitutional Limitations, 752; *Opinion of the Justices*, 62 Me. 596; *Rohrbacher* v. *Jackson*, 51 Miss. 735; *Van Valkenburg* v. *Brown*, 43 Cal. 43 (13 Am. Rep. 136); *Minor* v. *Happersett*, 88 U. S. (21 Wall.) 162; *Bloomer* v. *Todd*, 3 Wash. Ter. 599 (1 L. R. A. 111, 19 Pac. 140).

The constitution declares that in all elections not otherwise provided for every white male citizen of the United States, of the age of 21 years, shall be entitled to vote at all elections "authorized" by law. When the legislature of this state passed section 2599 it had no power to declare who should be legal voters at a school election other than as provided in article II, section 2, of the constitution, and, the qualifications of voters being determined and limited by said section 2, the legislature cannot enlarge or abridge those qualifications, and therefore said act of February 20, 1891, is repugnant to the constitution of this state, and is therefore void: *White* v. *Multnomah County Commissioners*, 13 Or. 319 (57 Am. Rep. 20);

State ex rel. v. Stevens, 29 Or. 464; Bloomer v. Todd, 3 Wash. Ter. 599 (1 L. R. A. 111, 19 Pac. 140); Minor v. Happersett, 88 U. S. (21 Wall.) 162; Cooley on Constitutional Limitations, 753; Green v. Shumway, 39 N. Y. 418; Brown v. Grover, 6 Bush. 1; Lyman v. Martin, 2 Utah, 136; Allison v. Blake, 57 N. J. Law, 6 (25 L. R. A. 480, 29 Atl. 417).

The act of February 20, 1891, provides qualifications for voters at school elections not included in section 2, article II, and also extends the elective franchise to female citizens who are not included in section 2, and, therefore, said act is null and void: Cooley on Constitutional Limitations, 756; Page v. Allen, 58 Pa. 338 (98 Am. Dec. 272); Capen v. Foster, 12 Pick. 485 (23 Am. Dec. 632); Gibbons v. Ogden, 22 U. S. (9 Wheat.) 187; United States v. Cruikshank, 92 U. S. 542; Bloomer v. Todd, 3 Wash. Ter. 599 (1 L. R. A. 111, 19 Pac. 140); Re Inspectors of Election, 25 N. Y. Supp. 1063; Re Cancelation from Registry, 26 N. Y. Supp. 167, 5 Misc. 375; State v. Adams, 2 Stew. (Ala.) 231; Quinn v. State, 35 Ind. 485 (9 Am. Rep. 754); State, Cornish v. Tuttle, 53 Wis. 45; People, Van Bokkelen v. Canaday, 73 N. C. 198 (21 Am. Rep. 465); State, Knowlton v. Williams, 5 Wis. 308 (68 Am. Rep. 65); 6 Am. & Eng. Enc. Law (1st Ed.), 263; State ex rel. Kimball v. Hendee, 58 N. J. Law, 307; State ex rel. Chamberlain v. Cranbury Board of Education, 57 N. J. Law, 605 (31 Atl. 1033); Landis v. Ashworth, 57 N. J. Law, 509 (31 Atl. 1017); Chase v. Miller, 41 Pa. 403; Bourland v. Hildreth, 26 Cal. 161; People ex rel. Twitchell v. Blodgett, 13 Mich. 127; People ex rel. Ahrens v. English, 139 Ill. 622 (15 L. R. A. 131);

*White* v. *Multnomah County Commissioners* 13 Or. 319
(57 Am. Rep. 20); *State ex rel.* v. *Stevens*, 29 Or.
464; *Rison* v. *Farr*, 24 Ark. 161 (87 Am. Dec. 52);
*Lyman* v. *Martin*, 2 Utah, 136; *St. Joseph Railroad
Company* v. *Buchanan County Court*, 39 Mo. 485.

A school election in this state is an election author-
ized by law, in contemplation of article II, section 2,
of the state constitution, and the legislature cannot
prescribe the qualifications of voters at such election
other than as prescribed in said section 2. From the
very language of that section there is no doubt that
the people reserved to themselves the exclusive right
and power to control the elective franchise of the state
at any election that the legislature had power to au_
thorize in pursuance of the constitution. A discre-
tionary power for the creation of new county officers,
district, precinct, or even state officers, was reposed by
the constitution in the legislature; but there is not a
section or a sentence in the constitution where the
right is vested in the legislative assembly to abridge,
extend or enlarge the elective franchise at any elec-
tion held in pursuance of law in this state. Sections
6 and 7, of article VI do not qualify or abridge any
part of section 2 in article II. Evidently the framers
of the constitution and the people who adopted it
anticipated the growth of population of the state, and
knew as a matter of fact that the counties, precincts,
townships and cities would multiply, and also that the
public business of the state and all its political sub-
divisions would increase, thereby making it necessary
to create new offices, and provided a way by which
the public requirements in this regard might be met.

Section 7, *supra*, does not confer on the legislature the power to say who shall be a legal voter at any election authorized by that body that would in any way conflict with article II, section 2, *supra*.

It is a fundamental rule of construction of a constitution that all the sections relating to the same subject should be read together and the intent of the framers ascertained. And further, that where a thing is specifically declared, defined or stated, its force or meaning cannot be qualified or enlarged by mere implication by some word, or sentence in another section. When article II, section 2, was promulgated the framers of that instrument had directly in mind the question of suffrage, and did in the most direct and apt language define who should be a "legal voter" in this state at "all" elections then provided for or hereafter authorized or provided for by law. This section, *supra*, relates alone to the subject of suffrage, and specifically defines who may be a legal voter in this state; hence, it is impossible under that view to conclude that any other article or section of the constitution modifies or conflicts with said section 2. Sections 3, 4, 5 and 6 of article II declare who may not vote, but section 2 alone declares who may vote.

Another rule of construction is that recourse may be had to the customs and institutions existing at the time the law was enacted to ascertain the intention of the legislature. Following this well established rule of construction I cannot escape the conclusion that it was the intent of the constitution to withhold from the legislature the power to enlarge or restrict the elective franchise in this state, that power being for-

ever reserved exclusively in the people. What were the habits and customs of the people of Oregon when the constitution was framed and ratified? Prior thereto, at the time of its adoption and ever afterwards, up to the act of 1889, (2 Hill's Code, § 2609), none but male citizens exercised the privilege of suffrage, even in the most limited degree. In the early history of our state none but manhood suffrage was even talked about or thought of. (The "new woman" had not then appeared. All honor to the "old woman." May her tribe never grow less). With such a public sentiment as existed in this state in 1858-9, surrounding the constitutional convention that framed our constitution, and the custom of the people respecting suffrage that had obtained from the very beginning, how could it be in the mind of the fathers of the constitution to clothe the legislature with power to restrict or enlarge at some remote period the elective franchise? Such an idea is utterly repugnant to the spirit of the times, to the influences that surrounded the constitutional convention, and to the sentiment of the state.

I think it will not be contended that article VI, sections 6, 7 or 8, either confers power on the legislature to enlarge or restrict the elective franchise, or to impose conditions other than contained in article II, section 2, *supra,* so far as regards the election of township, precinct or city officers. And if no such power is vested in the legislature respecting the qualifications of voters at elections in these small political divisions in the state, where does it deraign power to prescribe different qualifications of a voter at an elec-

tion in a school district? A school district is one of
the political subdivisions of the state or county, and
is at least a *quasi* public corporation, created by law,
the authority for which rests on article VIII, section
3 of the constitution. But said article VIII does not
confer power on the legislature to prescribe the quali-
fications of voters. It is silent on the subject. And
why? Simply because the constitutional convention
finished its work on the subject of suffrage when it
adopted section 2 of article II. In other words, a
school district election is held pursuant to law in con-
templation of said section: *White* v. *Commissioners*, 13
Or. 319 ( 57 Am. Rep. 20, 10 Pac. 484); *State ex rel.* v.
*Stevens*, 29 Or. 464; *People ex rel.* v. *English*, 139 Ill.
622 (15 L. R. A. 131, 29 N. E. 678); *State ex rel. Kim-
ball* v. *Hendee*, 58 N. J. Law, 307 (30 Atl. 894); *Landis* v.
*Ashworth*, 57 N. J. Law 509 (31 Atl. 1017); *State ex rel.
Chamberlain* v. *Cranbury Board of Education*, 57 N. J.
Law, 605 (31 Atl. 1033); *Green* v. *Shumway*, 39 N. Y.
418; Cooley's Constitutional Limitations, 37, 38, 756.

The laws conferring or relating to suffrage are
strictly construed: *Bailey* v. *Fiske*, 34 Me. 77; *Monroe*
v. *Collins*, 17 Ohio St. 665; Cooley's Constitutional
Limitations, 487; *People* v. *Dean*, 14 Mich. 406;
*White* v. *Multnomah County Commissioners*, 13 Or.
319 (57 Am. Rep. 20, 10 Pac. 484); *State ex rel.* v.
*Stevens*, 29 Or. 464; *Bloomer* v. *Todd*, 3 Wash. Ter. 599
(1 L. R. A. 111, 19 Pac. 140); *Minor* v. *Happersett*, 88
U. S. (21 Wall.) 162.

The legislature had, under the constitution, the
power to establish a common school system, but there
is not even an implication in any of the provisions of

the constitution relating to that subject conferring on the legislature power to extend suffrage to women, nor to impose upon male citizens any different qualifications at a school election than already imposed by the constitution: Constitution, article II, section 2; *White* v. *Multnomah County Commissioners*, 13 Or. 319 (57 Am. Rep. 20, 10 Pac. 484); *State ex rel.* v. *Stevens*, 29 Or. 464; *State* v. *Adams*, 2 Stew. (Ala.) 239; *Re Cancelation from Registry*, 5 Misc. 375; *Re Inspectors of Election*, 25 N. Y. Supp. 1063; *State ex rel. Allison* v. *Blake*, 57 N. J. Law, 6 (25 L. R. A. 480); *Landis* v. *Ashworth*, 57 N. J. Law, 509; *People ex rel. Ahrens* v. *English*, 139 Ill. 622 (15 L. R. A. 131); *Chase* v. *Miller*, 41 Pa. 403; *Bourland* v. *Hildreth*, 26 Cal. 161; *People*, *Twitchell* v. *Blodgett*, 13 Mich. 127; 6 Am. & Eng. Enc. Law (1st Ed.), 263.

For respondent there was an oral argument by *Mr. Geo. B. Dorris*, and a brief to this effect.

Article II, section 2, of the constitution only applies to state, county and precinct officers, provided for in the constitution, and such other state, county and precinct officers that may be authorized under article VI, section 7, of the constitution since its adoption. School directors are not mentioned in the constitution, and are not constitutional officers: *Re Gage*, 141 N. Y. 112 (25 L. R. A. 781); *State ex rel. Crosby* v. *Cones*, 15 Neb. 444; *Wheeler* v. *Brady*, 15 Kan. 26; *Plummer* v. *Yost*, 144 Ill. 68 (19 L. R. A. 110); *Belles* v. *Burr*, 76 Mich. 6; *Opinion of Justices*, 115 Mass. 602; *Buckner* v. *Gordon*, 81 Ky. 665; Cooley's Constitutional Limita-

tions, 173; *People, Twitchell* v. *Blodgett*, 13 Mich. 127; Oregon Constitution, article I, section 33.

MR. JUSTICE WOLVERTON delivered the opinion.

The sole question presented by this cause is whether women are entitled to vote at a school meeting for director of the district in which such meeting is held.    The plaintiff was awarded damages in the court below for having been denied the privilege of voting, from which judgment defendants appeal.

The law under which the right is claimed is as follows:    "Section 1.    In all school districts in this state with a population of 1,000 and upwards, any citizen of this state shall be entitled to vote at a school meeting who is 21 years of age, and has resided in the district 30 days immediately preceding the meeting and has property in the district upon which he or she pays a tax":    Session Laws, 1891, 130.    The contention of counsel for defendants is that the law is violative of section 2 of article II of the state constitution, which reads as follows:    "In all elections not otherwise provided for by this constitution, every white male citizen of the United States, of the age of 21 years and upwards, who shall have resided in the state during the six months immediately preceding such election, and every white male of foreign birth of the age of 21 years and upwards, who shall have resided in this state during the six months immediately preceding such election, and shall have declared his intention to become a citizen of the United States one year preceding such election, conformably to the laws of the United States on the

subject of naturalization, shall be entitled to vote at all elections authorized by law." In this connection we direct attention to section 3 of article VIII on "Education and School Lands," as we shall give a brief history of territorial and state legislation touching the organization and promotion of the common school system. The section referred to is as follows: "The legislative assembly shall provide by law for the establishment of a uniform and general system of common schools." The act of congress authorizing the territorial government of Oregon, approved August 14, 1848, provided, among other things, "that every white male inhabitant above the age 21 years, who shall have been a resident of said territory at the time of the passage of this act, and shall possess the qualifications hereinafter prescribed, shall be entitled to vote at the first election, and shall be eligible to any office within the said territory; but the qualifications of voters and of holding office, at all subsequent elections, shall be such as shall be prescribed by the legislative assembly; *provided,* that the right of suffrage and of holding office shall be exercised only by citizens of the United States above the age of 21 years," etc. Under the power thus delegated, the territorial legislature provided by law "that all white male inhabitants over the age of 21 years, who shall have resided within this territory for six months next preceding an election, shall be entitled to vote at any election for delegate to congress, and for territorial, county and precinct officers; *provided,* that they shall be citizens of the United States, or shall have declared their intentions, on oath, to become such, and shall

have resided six months in the territory, and 15 days in the county where they offer to vote, next preceding the day of election ": Statute 1855, 6.

On January 31, 1855, an act was passed providing for the election of county superintendents of common schools, for the division of the inhabited portions of the several counties into convenient school districts, the organization of new ones, for the election of directors and clerks to hold until the next annual meeting, and for the election of their successors at such time. It provided that the superintendents should be elected by the legal voters of the respective counties at the annual elections, which, under general law, were to be held in the several election precincts in the territory on the first Monday in June of each year, and at the same time defined and prescribed the qualifications of voters at school meetings as the laws of congress permitted as follows: "Every inhabitant over the age of 21 years who shall have resided in any school district for one month immediately preceding any district meeting, and who shall have paid or be liable to pay any tax except road tax in said district, shall be a legal voter at any school meeting, and no other persons shall be allowed to vote ": Statute 1855, 458, 463. So far as we are now informed, this act was operative when the state constitution was adopted in 1857. At its session of 1862 the state legislature revised the common school system, and repealed the territorial act of January, 1855. The new act provided, as did the old, that the county superintendents should be elected by the legal voters of the several counties of the state, and such

provision remains unchanged to the present time.
The qualifications of voters at school meetings, how-
ever, were modified, and thus defined: "No person
shall be a voter at school meetings who is under
21 years of age, was not a resident of the district
one month preceding such meeting, and unless he
has paid other tax than road tax in the county in
which the district is located; women who are widows,
and have children and taxable property in the dis-
trict, may vote, by proxy or in person, at such meet-
ings, if they choose": General Laws, 1862, 42. In
1872, the legislature again enacted that "women who
are widows and have children to educate, and taxable
property in the district, and who have resided in the
district 30 days, as aforesaid, shall be entitled to
vote": Deady & Lane's Comp. Laws, 511. In 1878
it was enacted that "any citizen of this state shall be
entitled to vote at a school meeting who is 21
years of age, and has resided in the district 30
days immediately preceding the meeting, and who
has property in the district upon which he or she
pays a tax": Session Laws, 1878, 67. This is the
identical provision made applicable in 1891 to school
districts having a population of 1,000 and upwards.
As it pertained to all other districts, the law of 1878
was amended in 1889 by the addition of the words,
"or has children of school age to educate." We have
not adverted to all the modifications and changes in
the law touching the subject, but the foregoing will
suffice to indicate what manner of treatment it has
continuously and uniformly received at the hands of
the legislature.

Recurring to defendants' contention, it is argued that, notwithstanding these legislative enactments, the primary and fundamental law must govern, and that section 2, article II of the constitution is absolutely controlling in the premises; that the language of this section is so far reaching and comprehensive as to include all elections provided for by law under any intendment of the constitution looking throughout its whole scope and purview. The language employed does not make the purpose entirely clear. Reading the portions of the section about which the controversy arises in juxtaposition, we have: "In all elections not otherwise provided for by this constitution, every white male citizen * * * shall be entitled to vote at all elections authorized by law." It is not thought that the latter clause enlarges or circumscribes the significance of the first, and the reasonable interpretation of the section is that every white male citizen, etc., shall be entitled to vote at all elections not otherwise regulated by the constitution. In support of this proposition *State ex rel. Allison* v. *Blake*, 57 N. J. Law 6 (25 L. R. A. 480, 29 Atl. 417), a strong case, and well reasoned, is cited with others of like results. The constitutional provision there considered is as follows: "Every male citizen of the United States * * * shall be entitled to vote for all officers that now are, or hereafter may be, elective by the people." The office about which the contention centered was that of road commissioner in a district of a subdivided township, and it was held that the constitution applied to all officers, whether directly provided for therein or created by

law, the incumbents of which are made elective by the people. Anticipating somewhat the position of the respondent, and in refutation thereof, the case of *State ex rel. Kimball* v. *Hendee*, 57 N. J. Law 307 (30 Atl. 894), is also cited, wherein this language is used by DIXON, J., speaking for the court: " In *State ex rel. Elkin* v. *Deshler*, 25 N. J. Law 177, it was adjudged that trustees of school districts were officers, within this constitutional provision. But it is said this adjudication has ceased to be authoritative, because, since it was rendered, an amendment of the constitution has imposed on the legislature the express duty of providing for the maintenance and support of a thorough and efficient system of free public schools. I am quite unable to see how the imposition of this duty affects the question whether school trustees are officers, or whether, if they are made elective by the people, any other than constitutional voters may vote for them. This duty of the legislature must be performed in accordance with all other constitutional provisions." These authorities illustrate quite clearly the defendants' position.

Upon the other hand, the contention of counsel for plaintiff is, in effect, that the authority granted by the constitution to the legislative assembly to " provide by law for the establishment of a uniform and general system of common schools " is a thing quite apart from the fundamental provisions touching suffrage and elections, in so far as it respects school districts which comprise the primary unit of the school system and its officers. That is to say that, while the elective franchise thus defined and established is

applicable in elections to fill all constitutional offices
and those provided for by law, yet that by the special
grant of authority to the legislature to devise a uni-
form and general system of common schools it has
been empowered, not only to call into requisition the
school district as the fundamental unit of the system,
but to prescribe what officers should be chosen to pro-
mote and maintain its existence, together with their
powers and duties, term of office, and how and by
whom they should be chosen.   And it is urged that
the contemporaneous and subsequent exposition of the
constitution by the legislative assembly as exemplified
by its acts has much to do with strengthening the
position.   The following authorities are cited in sup-
port thereof:   *Belles* v. *Burr*, 76 Mich. 1 (43 N. W.
24); *Re Gage*, 141 N. Y. 112, (25 L. R. A. 781, 35 N. E.
1094); *Plummer* v. *Yost*, 144 Ill. 68 (19 L. R. A. 110,
33 N. E. 191); *Opinion of the Justices*, 115 Mass. 602;
*State ex rel. Crosby* v. *Cones*, 15 Neb. 444 (19 N. W.
682); *Wheeler* v. *Brady*, 15 Kan. 26.

The Michigan case is much to the purpose from an
historical analogy *as well as* from the similarity of
those features of the constitutional provisions bearing
upon the question under consideration.   The pro-
vision of the Michigan constitution relating to suffrage
and elections in force at the time the decision was
rendered was adopted in 1850, and is as follows: "In
all elections every male citizen, every male inhabitant,
*   *   *   shall be an elector, and entitled to vote;
but no citizen or inhabitant shall be an elector or en-
titled to vote at any election unless he shall be above
the age of 21 years, and has resided in this state

three months, and in the township or ward in which he offers to vote ten days, next preceding each election": Article VII, section 1. Section 4, article XIII, provides that "the legislature shall, within five years from the adoption of this constitution, provide for and establish a system of primary schools, whereby a school shall be kept, without charge for tuition, at least three months in each year in every school district in the state." A former constitution, adopted in 1835, contained provisions not essentially different, except the words "a system of common schools" were used instead of "a system of primary schools." Under the older constitution, the legislature of 1838 confined the right of suffrage at school meetings to males residing in the district and who were liable to pay a school tax, making no distinction between aliens and citizens. In 1846 the privilege was extended somewhat, and the amendment then adopted was stricken out in 1847. Thereafter the law remained as in 1838 until 1855, and was in force at the time of the adoption of the constitution under which the decision was rendered. In 1855 qualified voters at school meetings were defined to be "all taxable persons residing in the district of the age of 21 years, and who have resided therein for the period of three months next preceding the time of voting." This law was amended in 1867, and again in 1881. But in the history of such constitutional provisions and the legislation under them the qualifications of an elector at school meetings have never been identical with those of an elector under the constitution. "In view of this fact," says MORSE, J., "it must have been the inten-

tion of the framers of the constitution of 1850, when they provided that the legislature should establish a a school system, following the constitution of 1835 in that respect, that under such provision the legislature should have full power to fix and determine the qualifications of voters under such system, and this without regard to the qualifications prescribed by the constitution for electors at other elections."

Language of similar import, by FINCH, J., characterizes the New York case. Speaking of the contention of counsel for appellant that school officers were not constitutional officers, because the practical interpretation of that instrument has long and invariably been to the contrary, he says: "That is true, and only true, of the officers of the school district, as the fundamental unit of the school system. The trustees of such a district are the authorized business managers of the school within its boundaries, and the legislature has always assumed and been permitted to assume the right to determine who might vote for such trustees, and what qualifications should or should not be requisite and necessary. To that class of school officers intrusted with the government and control of the simple school district, by itself alone and within its own boundaries, the constitutional provisions have never been applied." The Illinois case is of similar tenor, distinguishing the case of *People ex rel. Ahrens* v. *English*, 149 Ill. 622 (15 L. R. A. 131, 29 N. E. 678), wherein it was held that women had no right under the constitution to vote for county superintendent of schools, he being an officer recognized by the constitution, and within the purview of the pro-

visions relating to suffrage and elections. The cases from Massachusetts, Nebraska and Kansas are also in point. Several of these cases bear a striking analogy to the one at bar.

Under the Oregon territorial law of 1855 every inhabitant above the age of 21, without regard to sex, residing in the school district one month, and who paid or was liable to pay a tax, except road tax, was declared to be a legal voter at school meetings. By the same act, which prescribed the qualifications of voters at school meetings, it was ordained that a county superintendent of common schools should be elected by the legal voters, as elsewhere defined, of the respective counties. While such was the law the constitution was adopted and the state admitted into the Union, the constitution itself by special provision continuing all laws of the territory consistent therewith in force until altered or repealed. In 1862 our state legislature, by an act relating to common schools, revised the entire scope of the school system theretofore existing, and by special mention repealed the territorial laws above referred to. This act provided for the election of a county school superintendent by the legal voters of the several counties of the state, but provided that widows having children and taxable property in the district might vote by written proxy or in person at school meetings. Since that time the legislature has frequently acted upon the subject, and the present law is the outgrowth of numerous amendments. But at all times during the various changes, and as the law now stands, the qualifications prescribed for voters at school meetings have been and are broad enough to

permit of women exercising the privilege, while the
legislature has constantly and uniformly required that
a county superintendent shall be elected by the legal
voters of the several counties.   The office of county
superintendent of common schools was created under
section 7, article VI of our constitution, and is recog-
nized and treated as a county office: *State ex rel.* v.
*Stevens,* 29 Or. 464 (44 Pac. 898).   And there can be
no question but that the term "legal voters," as ap-
plied to the election of that officer, is such as the con-
stitution has defined under section 2, article II.   So
that the state legislature has at all times, following in
the wake of the territorial legislature, discriminated
between legal voters who are qualified to vote for
officers recognized or created under the constitution
and voters at school meetings.   Thus we have a direct
legislative interpretation of the fundamental law, not
only approximately contemporaneous with the adop-
tion of that instrument, but by its every subsequent
act whenever it has legislated upon the subject.   If
we ascribe to the constitutional convention cognizance
of the laws of congress and the territorial regulations
thereunder touching the common school system, as
we must, because of the learning and sagacity of its
members, there is strong reason for believing that
they legislated fundamentally with reference to the
conditions as they found them, especially as we find
the legislature of 1862, so near the time of the adop-
tion of the constitution, and composed of some of the
same members, revising the school system, and to
that end specially repealing acts at least supposed by

them to have been carried over and continued opera-
tive by the very terms of the constitution itself.

These considerations lead to the conclusion that
the power ascribed to the legislature under the con-
stitution to provide for the establishment of a uniform
and the general system of common schools carries
with it plenary power to establish the unit of that
system, denominated a school district, to determine
what officers shall administer its affairs, who and
what manner of persons shall be eligible to office and
how and by whom they should be chosen. The elect-
ive franchise conferred by section 2, article II, does
not, nor was it intended to, fix and define the qualifica-
tion of voters at school meetings, but was designed
only to govern in all general and special elections not
otherwise provided for by the constitution, and ap-
plies to the election of all officers known to the consti-
tution, as well as to such as may be provided for there-
under aside from those provided for under the special
power of the legislature to establish a uniform and
general system of common schools. There is strong
logic in defendants' contention, and yet it is believed
there is sufficient ground for distinguishing the New
Jersey constitutional provisions from our own. If,
however, we are mistaken in this, then there is a
sharp conflict in the authorities, and we feel bound to
adopt the legislative construction which was placed
upon this feature of the constitution from its incep-
tion, and has ever since been maintained. "That
women are successful educators," says MAXWELL, J.,
in *State ex rel. Crosby* v. *Cones,* 15 Neb. 444 (19 N. W.
682), "is fully shown by experience." And in *Opin-*

*ion of the Justices*, reported in 115 Mass. 602, *supra*, it is said that "the common law of England, which was our law upon the subject, permitted a woman to fill any local office of an administrative character, the duties attached to which were such that a woman was competent to perform them." So that there existed high authority for the inauguration of the exact system of common schools that we now have under the constitution as interpreted by the legislature in the adoption of law for its promotion.

AFFIRMED.