Argued December 21, reversed and dismissed December 28, 1915.
Rehearing denied January 18, 1916.

# THIELKE *v.* ALBEE.*

(153 Pac. 793.)

**Municipal Corporations—Power to Enact Emergency Ordinances.**

1. Article IV, Section 1, of the Constitution declares that a referendum may be ordered, except as to laws necessary for the immediate preservation of the public peace, health or safety, and Article IV, Section 1a, provides that the referendum powers reserved to the people by the Constitution are further reserved to the legal voters of every municipality as to all municipal legislation, taken in connection and construed with Section 3481, L. O. L., that was passed for the purpose of carrying above constitutional provisions into effect, authorizes emergency ordinances, and in view of Sections 47, 48, of the Portland City Charter, permitting the enactment of emergency ordinances, the city had power to enact emergency ordinances.

**Statutes—Construction of Doubtful Constitutional and Legislative Provisions.**

2. It is a well-settled rule in this state that contemporaneous construction of constitutional or legislative provisions, and long acquiescence in a particular interpretation, are very persuasive in leading courts to adopt and follow the same construction. (Citing *Biggs* v. *McBride*, 17 Or. 640 [21 Pac. 878, 5 L. R. A. 115].)

[As to general rules for construction of statutes, see note in 12 Am. St. Rep. 826.]

**Municipal Corporations—Validity of Ordinance Regulating Motor Buses.**

3. An ordinance requiring every person operating a jitney bus to obtain a city license is not unconstitutional and void, because it requires such person to first apply for and secure a certificate from the department of public utilities, neither is it invalid as vesting the commissioner with unreasonable and arbitrary power of issuing or refusing such certificate, thereby preventing one from securing such license, for such ordinance provides the right of appeal from any unjust action on the part of the commissioner.

**Municipal Corporations—Reasonableness of Classification of Jitney Bus Ordinance.**

4. An ordinance is not invalid as being unlawfully discriminatory, licensing and regulating the operation of jitney buses, and excluding from its operation railroad cars, street-cars, automobiles used exclusively as sight-seeing cars, hotel buses and taxi-cabs. Jitney buses *held* to represent a new class of common carriers, and being in a class entirely distinct from those excepted, the classification is therefore not unreasonable.

[As to what constitutes discrimination, see note in 48 Am. St. Rep. 236.]

*The matter of the regulation of jitney buses is discussed in note in L. R. A. 1915F, 840.                REPORTER.

From Multnomah: GEORGE R. BAGLEY, Judge.

This is a suit by A. A. Thielke, W. J. Christenson and W. L. Trullinger against H. R. Albee, Mayor of the City of Portland, to enjoin the enforcement of an ordinance of the City of Portland licensing and regulating the operation of jitney buses. A demurrer was interposed to the complaint, which was overruled by the trial court, and from a decree in favor of plaintiffs, defendants appeal: See 76 Or. 449 (150 Pac. 854).

REVERSED AND DISMISSED.

For appellant there was a brief with oral arguments by *Mr. Walter P. La Roche,* City Attorney, and *Mr. H. M. Tomlinson,* Deputy City Attorney.

For respondents there was a brief over the names of *Mr. A. W. Lafferty* and *Mr. R. L. Merrick,* with an oral argument by *Mr. Lafferty.*

In Banc.   MR. JUSTICE BENSON delivered the opinion of the court.

The question presented for our consideration is the sufficiency of the complaint, the substance of which is that on September 3, 1915, the city council of Portland passed an ordinance, entitled

"An ordinance licensing and regulating motor buses operated within the City of Portland and declaring an emergency."

The ordinance, a copy of which is attached to and made a part of the complaint, is alleged to be void for the following reasons: (1) That the city council violated the constitutional provision, reserving to the citizens of a municipality the power of the referendum, by declaring an emergency when, in fact, none existed; (2) that it is unconstitutional and void because it dis-

79 Or.—4

criminates against jitney buses in several detailed requirements of regulation which are not exacted from the operators of street-cars, taxicabs, sight-seeing automobiles, and other motor or electric vehicles or cars for carrying passengers; (3) that it is void for the reason that it requires motor buses, when approaching intersecting streets, to stop at the near crossing thereof to take on or discharge passengers; (4) that it is void because it requires that the rates charged shall be plainly painted on the wind shield of the car, and prohibits the collection of a greater charge than five cents in the absence of such posted rates; and (5) that it is unconstitutional and void because it commits to the commissioner of the department of public utilities and to the city council the arbitrary power of issuing or refusing certain certificates, and makes the issuance of licenses to operate motor buses dependent upon the previous issuance of such certificates, thereby enabling such commissioner and the city council to arbitrarily prevent plaintiffs from securing a license.

1. The trial court decided that, under the provisions of the Constitution of the State of Oregon, a municipality has no power to enact an emergency ordinance, and also determined that the fifth contention, *supra,* was well founded. Taking these points in their order, we observe that Article IV, Section 1, of our Constitution, so far as it pertains to the question before us, reads as follows:

"The second power is the referendum, and it may be ordered (except as to laws necessary for the immediate preservation of the public peace, health, or safety), either by the petition signed by 5 per cent of the legal voters, or by the legislative assembly, as other bills are enacted."

This section, as it now reads, was adopted by the people in 1902.  We next quote that portion of Article IV, Section 1a, which, so far as it is pertinent to this inquiry, reads thus:

"The initiative and referendum powers reserved to the people by this Constitution are hereby further reserved to the legal voters of every municipality and district, as to all local, special, and municipal legislation, of every character, in or for their respective municipalities and districts."

Respondent contends that this section specifically eliminates any power upon the part of a municipality to use the emergency clause in an ordinance.  This section of the Constitution became effective in 1906.  In 1907 the legislature passed an act providing for carrying into effect the referendum powers reserved by the people in Article IV, Section 1, and Section 1a of the Constitution on general, local, special and municipal legislation.  In Section 11 of that act the following language appears:

"No city ordinance, resolution, or franchise shall take effect and become operative until thirty days after its passage by the council and approved by the mayor, unless the same shall be passed over his veto, and in that case it shall not take effect and become operative until thirty days after such final passage, except measures necessary for the immediate preservation of the peace, health or safety of the city; and no such emergency measure shall become immediately operative unless it shall state, in a separate section, the reasons why it is necessary that it should become immediately operative, and shall be approved by the affirmative vote of three-fourths of all the members elected to the city council, taken by ayes and noes, and also approved by the mayor": Section 3481, L. O. L.

In 1913 the people of the City of Portland enacted the charter under which the ordinance in question was

adopted, and Sections 47 and 48 thereof read as follows:

"Sec. 47. Every ordinance, other than emergency ordinances, shall have three public readings, not more than two of which shall be at the same regular legislative session. At least one week shall elapse between the introduction and final passage of any ordinance and no ordinance shall be amended within one week of its final passage, except in case of an emergency ordinance. An emergency ordinance may be enacted upon the day of its introduction, providing that it shall contain the statement that an emergency exists, and specify with distinctness the facts and reasons constituting such emergency. The unanimous vote of all members of the council present, and of not less than four (4) members shall be required to pass an emergency ordinance.

"Sec. 48. Ordinances (a) making appropriations and the annual tax levy, (b) relative to local improvements and assessments therefor, and (c) emergency ordinances, shall take effect immediately upon their passage. All other ordinances enacted by the council shall take effect thirty days after their passage, unless a later date is fixed therein, in which event they shall take effect at such later date, subject to the referendum and subject to the provisions of Section 52 of this charter."

2. A number of cities in Oregon are now operating under charters containing similar provisions. The inevitable conclusion from these facts is that for a period of more than 9 years the state legislature, the people of the City of Portland, and those of many other municipalities have read Article IV, Section 1a, of the Constitution, and have understood it to empower city councils to pass ordinances, with emergency clauses appended thereto, in like manner as is done by the state legislature. The power has never before been questioned in this court, and in our opin-

ion it requires a strained construction to justify any other interpretation. But if there were any doubt as to the true meaning of the constitutional provision, it is a well-settled rule that contemporaneous construction of constitutional or legislative provisions and long acquiescence in a particular interpretation are very persuasive in leading the courts to adopt the same construction. In the case of *Biggs* v. *McBride,* 17 Or. 640 (21 Pac. 878, 5 L. R. A. 115), which involved the power of the legislature to elect railroad commissioners, the court says:

"The power thus exercised has never been called in question, but has ever been acquiesced in by every department of the government, and is in itself a contemporaneous construction of the Constitution, which, if the question were doubtful, might be sufficient to turn the scale in its favor. Under any view, such construction is entitled to great weight, and could not be lightly regarded."

This doctrine has been approved by this court in the following cases: *Acme Dairy Co.* v. *Astoria,* 49 Or. 520 (90 Pac. 153); *Harris* v. *Burr,* 32 Or. 348 (52 Pac. 17, 39 L. R. A. 768). However, we regard the principle as too well established to require citation of authorities. As to whether or not the city council has exercised this power wisely is a question which we are not at liberty to consider: *Kadderly* v. *Portland,* 44 Or. 118 (74 Pac. 710, 75 Pac. 222).

3. This brings us to a consideration of that part of the ordinance requiring the operator of the motor bus to secure a certificate from the commissioner of public utilities before applying for a license, and as to whether it renders the ordinance invalid as vesting the commissioner with unreasonable and arbitrary power. In support of this contention counsel for respondent has called our attention to but one citation of author-

ity, the case of *Yick Wo* v. *Hopkins,* 118 U. S. 356
(6 Sup. Ct. Rep. 1064, 30 L. Ed. 220), which we have ex-
amined with great care. This is a case growing out
of the anti-Chinese crusade in San Francisco some 30
years ago. An ordinance had been passed by the city
council requiring those who desired to engage in the
laundry business to first obtain a permit from the
board of supervisors of the city so to do. It was ad-
mitted that such permission had been refused to every
Chinese applicant and granted to every white person
seeking the same. Our view of this decision and its
effect are so clearly expressed in the case of *Ex parte
Fiske,* 72 Cal. 125 (13 Pac. 310), that we quote exten-
sively therefrom as follows:

"It is true, that, at first glance, a somewhat differ-
ent doctrine seems to have been stated in *Yick Wo* v.
*Hopkins,* 118 U. S. 356 [30 L. Ed. 220, 6 Sup. Ct. Rep.
1064]. A correct understanding, however, of the ex-
tent to which that case goes can be had only by con-
sidering that the proof, which the court looked into,
showed that the ordinance there under review was so
administered as to exclude the subjects of the emperor
of China, and none others, from the business of keep-
ing a laundry. The court, after alluding to our treaty
with China, says: 'In the present case we are not
obliged to reason from the probable to the actual, and
pass upon the validity of the ordinances complained
of as tried merely by the opportunities which their
terms afford of unequal and unjust discrimination in
their administration; for the cases present the ordi-
nances in actual operation, and the facts shown estab-
lish an administration directed so exclusively against
a particular class of persons as to warrant and require
the conclusion that, whatever may have been the in-
tent of the ordinances as adopted, they are applied
by the public authorities charged with their adminis-
tration, and thus representing the state herself, with
a mind so unequal and oppressive as to amount to a
practical denial by the state of that equal protection

of the laws which is secured to the petitioners, as to all other persons, by the broad and benign provisions of the fourteenth amendment to the Constitution of the United States. Though the law itself be fair on its face, and impartial in appearance, yet, if it is applied and administered by public authority with an evil eye and an unequal hand, so as practically to make unjust and illegal discriminations between persons in similar circumstances material to their rights, the denial of equal justice is still within the prohibition of the Constitution.' After alluding to the proof that the petitioners and 200 other Chinese were refused permission to carry on the business, while such permission was given to a large number of persons not Chinamen, the court says further: 'The fact of this discrimination is admitted. No reason for it is shown, and the conclusion cannot be resisted that no reason for it exists except hostility to the race and nationality to which the petitioners belong, and which, in the eye of the law, is not justified. The discrimination is therefore illegal; and the public administration which enforces it is a denial of the equal protection of the laws, and a violation of the fourteenth amendment of the Constitution.' It is evident from this language that the decision rested mainly upon the admitted discrimination against a class of persons in the public administration of the ordinance. Indeed, the admitted facts, which the court considered, showed that the intent of the ordinance was to exclude Chinamen from a business which should be open to all other persons, as clearly as if that intent had been boldly written on its face. The decision, therefore, as an authority, goes no further than to hold that, under a state of facts similar in character to the facts of that case, an ordinance similar in character to the one there passed upon would be invalid. But there are no such facts in the case at bar.''

In the opinion of the court in the case of *Yick Wo* v. *Hopkins,* 118 U. S. 356 (30 L. Ed. 220, 6 Sup. Ct. Rep. 1064), there is cited with approval the case of

*City of Baltimore* v. *Radecke,* 49 Md. 217 (33 Am. Rep.
239), which involved the power of the mayor and coun-
cil to issue a permit for the use of a steam engine in
a box factory within the city limits, which contained a
condition that the engine was "to be removed after six
months' notice to that effect from the mayor." In
both of these cases it will be observed that the occupa-
tion sought to be regulated was a lawful one, which
was to be carried on upon private property, a thing
which they possessed an absolute, constitutional right
to do. The authorities uniformly disclose a marked
distinction between such occupations and those similar
to the one in controversy. As has been well said in
the case of *Ex parte Dickey* (W. Va.), 85 S. E. 781:

"The right of a citizen to travel upon the highway
and transport his property thereon, in the ordinary
course of life and business, differs radically and obvi-
ously from that of one who makes the highway his
place of business and uses it for private gain, in the
running of a stage-coach or omnibus. The former is
the usual and ordinary right of a citizen, a common
right, a right common to all, while the latter is special,
unusual, and extraordinary. As to the former, the
extent of the legislative power is that of regulation;
but as to the latter, its power is broader. The right
may be wholly denied, or it may be permitted to some
and denied to others, because of its extraordinary
nature. This distinction, elementary and funda-
mental in character, is recognized by all the authori-
ties."

The ordinance in question goes quite fully into the
matters necessary to entitle an applicant to a license
for the operation of a motor bus, and, among other
things, requires the procuring of a certain certificate,
prescribing what it shall contain. This part of the
ordinance is to be read in connection with the other
provisions of the act, and an appeal is provided

against unjust action upon the part of the commissioner. We conclude, therefore, that the ordinance is not objectionable in this regard.

4. We come, then, to the contention that the ordinance is void because railroad cars, street-cars and automobiles used exclusively as sight-seeing cars, hotel buses and taxicabs are exempted from its operation. This question has been presented to the courts in several states, and in every case to which our attention has been called it has been held that the ''jitney'' bus represents a new class of common carriers, and the fact that a different kind of regulation is applied to it does not render such legislation unlawfully discriminatory or invalid.

In *Ex parte Cardinal,* 170 Cal. 519 (150 Pac. 349), the appellant was prosecuted for operating a jitney bus without giving a bond, as required by the ordinance, and he contended that the legislation was void by reason of unreasonable and discriminating provisions. In passing upon this question the court says:

''It is a matter of common knowledge on the part of those familiar with conditions in our large cities that the comparatively recent introduction of this class of vehicle, commonly known as the 'jitney,' for the carriage of passengers on the public streets, for a charge closely approximating that made on the street-cars, in view of the almost phenomenal growth of the institution, has made clearly apparent the necessity of some special regulations in order to reasonably provide for the comfort and safety of the public. It may well be that the board of supervisors concluded that, in view of the number of this class of public conveyances that were operated upon the public streets, especially upon the principal streets already occupied almost to overflowing during the hours of heaviest traffic by street-cars and other vehicles, as well as by pedestrians at street crossings, the speed at which they would naturally be operated in order to make

them pay on such a low rate of fare, and the probable lack of substantial financial responsibility on the part of very many undertaking to operate such vehicles, special regulations as to condition of car, competency and fitness of operator, and the operation of the car, as well as security to protect against improper or negligent operation, were essential to the public safety. We certainly cannot say that the legislative body was not justified in so determining.''

In the case of *Nolen* v. *Riechman* (D. C.), 225 Fed. 818, 819, 820, the court says:

''As stated in the caption of the act, the purpose of the legislature was to define as common carriers within this state, persons, firms and corporations operating certain self-propelling public conveyances and affording means of street transportation similar to that ordinarily afforded by street railways, but not operated upon fixed tracks, to declare their business a privilege, to regulate the same, and to require such common carriers to give bond to indemnify against loss of life and damage to person and property. Here is a new class of common carriers, clearly pointed out and defined in the law, differing in material respects from other common carriers. For reasons no doubt sufficient in the minds of the lawmakers, this new class of common carriers is required to execute a bond to indemnify against loss those who might be damaged in person or property, through negligence.

''Confessedly steam and street railway companies and owners and operators of omnibuses are not required to give bond for protection to those negligently injured by them, such as is provided for in the act under consideration; but it is of common knowledge that statutory requirements, both federal and state, relating to and regulating common carriers, materially differ. While the services they all render are those of common carriers, yet the services are so different in detail that it would be wholly impracticable to write a statute applicable to them all, and serve, at the same time the convenience and safety of the public. * *

"It may well have been that the legislature had in mind, when it enacted the statute in question, that those engaging in the business which the act sought to regulate operated vehicles susceptible of becoming dangerous to the public by manner of their operation; that they had no fixed track upon which to run, and were at liberty to move over the entire surface of the street; that they had no schedule; that pedestrians had no way of knowing when and where to expect them; that they increased the danger to persons using the street, whether as pedestrians or while boarding or leaving street-cars or other vehicles; that they stopped at street crossings, or along the curb between street crossings, to receive and discharge passengers; that very often the driver owns the machine, or at least an equity in it; that many of them are financially irresponsible; that the patrons of such vehicles are composed of men women and children; that the vehicles, in the hands of careless drivers, might rush through crowded streets at a dangerous rate of speed, probably without any financial responsibility to their patrons or others upon whom damage might be inflicted by such machines, because of the negligence of the operators. * *

"There is another distinction that should be noted. It concerns the taxicab. While the 'jitney' and the taxicab are physically the same, yet the services they perform materially differ. The service of the one is designed to accommodate persons traveling along distinct routes, and at a rate of fare common to all; but the service of the other is intended for the accommodation of persons whose destinations involve varying distances and lines of travel, and presumably at varying prices. The two kinds of service would signify substantial difference in numbers of vehicles needed to meet the respective demands; and so the dangers attending the operation of the 'jitney' presumably would materially exceed those arising in the taxicab service. These considerations are independent of the question argued by counsel whether the taxicab is not embraced within the terms of the statute—a question we do not decide."

Upon the same question there will be found an interesting discussion in the case of *State* v. *Howell,* 85 Wash. 294 (Ann. Cas. 1916A, 1231, 147 Pac. 1159). We think it is quite clear that motor buses, as defined in the ordinance, are in a class entirely distinct from those excepted, and that therefore the classification is not unreasonable. It follows that the demurrer should be sustained. An order will be entered here, sustaining it and dismissing the suit.

REVERSED.   SUIT DISMISSED.

MR. JUSTICE EAKIN did not sit.

MR. JUSTICE BURNETT delivered the following dissenting opinion.

On September 3, 1913, the council of the City of Portland passed an ordinance licensing and regulating what it called "motor buses," concluding with Section 26:

"An emergency is hereby declared to exist in this: The present laws regulating motor buses being inadequate, it is necessary in order to protect the health, peace and safety of the people of the City of Portland, that this ordinance be passed immediately; therefore this ordinance shall be in force and effect from and after its passage by the council."

In a suit by the plaintiffs to enjoin the enforcement of this municipal enactment, the Circuit Court forbade all manner of execution of the same until October 4, 1915, assigning as a reason that the ordinance was not exempt from the referendum power reserved to the legal voters of municipalities. The decree restrained the operation of the measure after that date in part only. It is contended that the conclusion of the learned circuit judge was erroneous on the first point, and that city law-making bodies have as much right

as the legislative assembly of the state to pass laws which they deem necessary for the immediate preservation of the public peace, health or safety, and at the same time take them out of the operation of the referendum power. As pertains to this case, this is a moot question, and ought not to be decided here at this time. The only effect it had upon the ordinance as a whole in the Circuit Court was to postpone its operation to a date now long past. The remainder of the decree of the Circuit Court enjoined permanently only part of the ordinance. We have often said that we will not decide academic questions: *Moores* v. *Moores,* 36 Or. 261 (59 Pac. 327); *State ex rel.* v. *Grand Jury,* 37 Or. 542 (62 Pac. 208); *State ex rel.* v. *Fields,* 53 Or. 453 (101 Pac. 218); *State ex rel.* v. *Webster,* 58 Or. 376 (114 Pac. 932); *Portland* v. *Investment Co.,* 59 Or. 598 (117 Pac. 991); *Dimick* v. *Latourette,* 72 Or. 231 (143 Pac. 896). On this ground, as well as upon the merits, I am compelled to withhold my assent to the conclusion reached by Mr. Justice BENSON on this point.

In Article IV, Section 1, of the state Constitution the people said:

"The legislative authority of the state shall be vested in a legislative assembly, consisting of a senate and house of representatives, but the people reserve to themselves power to propose laws and amendments to the Constitution and to enact or reject the same at the polls, independent of the legislative assembly, and also reserve power at their own option to approve or reject at the polls any act of the legislative assembly."

The last clause defines a power which a subsequent part of the section names "referendum." True enough, as pointed out further on in the section, it is said this power "may be ordered except as to laws

necessary for the immediate preservation of the public peace and health or safety.''

This, however, does not constitute any part of the definition of the power itself. It amounts only to an exception of certain things in state legislation to which the reserved popular prerogative will not be applied. This section of the Constitution was adopted in 1902. Four years later Article IV, Section 1a, was added to the fundamental law. It declares that:

''The initiative and referendum powers reserved to the people by this Constitution are hereby further reserved to the legal voters of every municipality and district as to all local, special, and municipal legislation, of every character, in or for their respective municipalities and districts.''

The exception mentioned in the section adopted four years previously was not imported into the later amendment. On the contrary, it expressly says that the referendum shall apply to all municipal legislation of every character, plainly specifying that there shall be no exception to this power when exercised by the legal voters of a city. It is contended that an emergency might arise where it would be highly important to have immediate city legislation on some subject, but this is a legislative argument, and ought not to be considered in the construction of plain terms of the Constitution. The same reason for it does not exist in the case of a local municipality as in the state at large whose legislative assembly meets only biennially. The general design of Section 1a was to invest the people themselves in every locality with complete power over local legislation of every character; and we can safely trust to the patriotism and public spirit of the voters of any city not to interfere with legislation which is really needful. Besides this, it is

said, in a later clause of the section under consideration:

"The manner of exercising said powers shall be prescribed by general laws, except that cities and towns may provide for the manner of exercising the initiative and referendum powers as to their municipal legislation."

In view of this excerpt, cities may provide for the manner of exercising the referendum, but they cannot entirely exclude its operation as to any measure. The mention of the power specified debars all side pretenses of any city council to prevent the legal voters of the city from exercising the referendum. It is plain that a city council has no right to pass an emergency ordinance, and that the power to do so resides only in the legal voters of the municipality.

Defining the vehicle to be regulated, the ordinance contains this provision:

"The word 'motor bus' shall mean and include any motor vehicle engaged in the business of carrying passengers for hire which is held out or announced by sign, voice or other device or advertisement to operate or run, or which is operated or run over a particular route, or to a particular point, or between particular points; provided that railroad cars or street-cars and automobiles used exclusively as sight-seeing cars, hotel buses and taxicabs shall not be considered motor buses within the meaning hereof."

Sections 13 and 14 read thus:

"The chassis, wheels and brakes of all motor buses operated in the City of Portland shall be kept in a safe condition. At least once every thirty days each motor bus operated in the City of Portland shall be inspected by some person authorized by the City of Portland to make such inspection for the purpose of ascertaining whether or not the steering gear, brakes and other safety appliances of such motor bus are in proper

working condition. And it shall be unlawful for any person to accept for transportation or to transport any person in any motor bus in the City of Portland the steering gear or brakes or other safety appliances of which, upon inspection, have been found to be in an unsafe condition. The left-hand rear door of all motor buses shall be kept permanently closed.''

''Between thirty (30) minutes after sunset and sunrise whenever the top of a motor bus is up such motor bus shall be well lighted on the inside thereof, and any driver or chauffeur failing to maintain such light shall be deemed guilty of a violation of this ordinance.''

The provisions relating to their operation are found in Sections 8 and 24:

''Between the hours of 6:00 o'clock A. M. and 8:00 o'clock A. M. all motor buses shall be operated to the outer terminus of their routes, but may turn back upon discharging the last inbound passenger, and between the hours of 4:30 o'clock P. M. and 7:00 o'clock P. M. all auto buses shall be operated to the inner terminus, but may turn back upon discharging the last outbound passenger. During all other hours of operation all motor buses shall complete the trip to the termini of their routes. Provided, such buses may divert from regular route to deliver passengers if consented to by other passengers.''

''Motor buses may divert from their route to deliver or call for passengers at ball games or other points of amusement.''

It may be conceded that the propensity to investigate, agitate, legislate and regulate finds it proper object in any public service. It is indeed true that the police power may be applied to the control of any private business occupying public streets for purposes of its own. The question here is not whether carriers of passengers by automobile are proper subjects for the application of the police power, for that is beyond dispute. The matter to be determined is whether the

classification prescribed by the ordinance is fair, reasonable, and not discriminatory between individuals and things actually in the same category. The attack made by plaintiffs upon the ordinance, for the reason that it differentiates street-cars and motor buses as therein defined, is not well grounded. The distinction between the street-car and the ordinary automobile is a legitimate classification, for the former runs by electricity furnished from a distant point and on a fixed track, while the latter is moved by a gasoline engine or storage batteries and goes anywhere on any street. The relation of the street-car to the public may be safely left to the terms of its franchise, while the regulation of the large number of individuals embraced in the class of automobile owners is properly referred to city legislation so far as a municipality has power to enact ordinances upon the subject.

It is said in *State* v. *Redmon,* 134 Wis. 89 (114 N. W. 137, 126 Am. St. Rep. 1003, 15 Ann. Cas. 408, 14 L. R. A. (N. S.) 229):

"It is a judicial function to determine the proper subjects for police regulations and a legislative function to determine, primarily, the expediency of regulation and the character thereof subject to judicial supervision to the extent of determining, in cases as they arise, whether the boundaries of reason have been so clearly exceeded as to violate some constitutional prohibition, express or implied; the judgment of the legislature being controlling unless it appears beyond reasonable controversy that the interference is unreasonable."

It is said in *Mugler* v. *Kansas,* 123 U. S. 623, 661 (31 L. Ed. 205, 8 Sup. Ct. Rep. 273, 297):

"The courts are not bound by mere forms, nor are they to be misled by mere pretenses. They are at liberty—indeed, are under a solemn duty—to look at the

79 Or.—5

substance of things, whenever they enter upon the inquiry whether the legislature has transcended the limits of its authority. If, therefore, a statute purporting to have been enacted to protect the public health, the public morals, or the public safety, has no real or substantial relation to those objects, or is a palpable invasion of rights secured by the fundamental law, it is the duty of the courts to so adjudge, and thereby give effect to the Constitution.''

Speaking of the subject of classification, in *Connolly* v. *Union Sewer Pipe Co.*, 184 U. S. 540, 560 (46 L. Ed. 679, 22 Sup. Ct. Rep. 431) the Supreme Court of the United States said:

''The difficulty is not met by saying that, generally speaking, the state when enacting laws may, in its discretion, make a classification of persons, firms, corporations and associations, in order to subserve public objects. For this court has held that classification 'must always rest upon some difference which bears a reasonable and just relation to the act in respect to which the classification is proposed, and can never be made arbitrarily and without any such basis. * * But arbitrary selection can never be justified by calling it classification. The equal protection demanded by the fourteenth amendment forbids this. * * No duty rests more imperatively upon the courts than the enforcement of those constitutional provisions intended to secure that equality of rights which is the foundation of free government. * * It is apparent that the mere fact of classification is not sufficient to relieve a statute from the reach of the equality clause of the fourteenth amendment, and that in all cases it must appear, not only that a classification has been made, but also that it is one based upon some reasonable ground—some difference which bears a just and proper relation to the attempted classification—and is not a mere arbitrary selection.''

In *State* v. *Wright*, 53 Or. 344 (100 Pac. 296, 21 L. R. A. (N. S.) 349, note), speaking by Mr. Justice ROBERT S. BEAN, this court said:

"That the state may, under its police powers, license and regulate the business of peddling by requiring those engaged therein to obtain a license is conceded. This, however, is because gross frauds and cheats are likely to, or may, attend the business, if carried on by irresponsible and dishonest persons, and not because of the articles sold. And while it is possible the state may divide peddlers into different classes, requiring a license from one and not from the other, such classification, if valid at all, must be based upon some reasonable ground of differences, and not be an arbitrary discrimination between persons engaged in the same class of business. * * A statute, which directly or by implication grants special privileges, or imposes special burdens upon persons engaged in substantially the same business, under the same conditions, cannot be sound, because it is class legislation, and an infringement of the equal rights guaranteed to all. * * It is true a state may impose a tax on, or require a license from, persons engaged in certain callings or trades, without being bound to include all persons or all property that may be legitimately taxed for governmental purposes. * * But the classification must be on some reasonable basis, and the law, when enacted, must apply alike to all engaged in the business or occupation."

This case was expressly approved in *State* v. *Miller,* 54 Or. 381 (103 Pac. 519). In *Spaulding* v. *McNary,* 64 Or. 491 (130 Pac. 391), Mr. Justice MOORE, speaking of the police power, said:

"It must be conceded that the sale of some kinds of goods and the transaction of some classes of business are in themselves, regardless of the persons connected therewith, so inherently harmful as to violate every sense of propriety and modesty, and in such cases the state rightfully may and necessarily ought immediately to put a stop to the flagitious traffic. Within the category thus condemned the sale of carriages cannot be included, and though there may be found one or more agents soliciting sales of buggies whose lives and conduct are not governed by the strictest rules of

probity, the business in which they are engaged is not essentially unlawful, and therefore not subject to an exercise of the police power.''

In this excerpt the court has gone so far along the path of judicial control of the police power as to say that some forms of business, not essentially harmful, are exempt from that form of governmental authority.

The precise point here involved was decided by this court in an opinion written by Mr. Chief Justice EAKIN in *Kellaher* v. *City of Portland,* 57 Or. 575 (112 Pac. 1076). That was a suit by the plaintiff and 181 others to enjoin the city from enforcing an ordinance taxing vehicles used upon the streets of the city. The complaint was that the enactment unjustly discriminated between vehicles doing substantially the same kind of business. The opinion says in part:

''However, we are unable to uphold the classification which omits from its terms automobiles used in connection with the owner's business, which we are justified in assuming as a matter of common knowledge includes a large number of automobiles used by department stores, breweries, groceries, express companies, physicians and others, not used for hire, * * and are in the same class as those taxed by the ordinance * * : 'For each delivery wagon delivering goods, wares or merchandise within the city, without charge, drawn by two animals; for each delivery wagon drawn by one animal.' * * It is an arbitrary classification to say that an automobile using the streets for the same purpose as those vehicles drawn by horses which are taxed shall pay no vehicle tax. Such classification is not made on a reasonable basis, and renders the ordinance void.''

In *State ex rel.* v. *Swigert,* 59 Or. 132 (116 Pac. 440), an analogous application of the principle was made. In that proceeding there was drawn in question the validity of the statute providing that ports containing

a population of more than 100,000 should be governed by a board of seven commissioners, to be appointed by the Governor for a term of four years. Speaking on the subject involved, the opinion states:

"Furthermore, the classification must be upon some real and actual distinction as a justification for it. We conceive that no distinction exists for a different rule in ports of 100,000 population than for those with a lesser population as to the limitation of the term of office or time or manner of election. No reason is named in the act, nor is any suggested by counsel. If none exists, then the classification is illusory, and without existence in fact, and the law is special. There must be a difference in the situation, circumstances and requirements of the ports as the ground for the classification, and not special legislation under that guise. * * And we conclude that the classification is an arbitrary one, and that the law in fact applies only to the Port of Portland, and exempts from its provisions all other ports. * * It is also objectionable because the attempted classification of ports affected by its provisions is arbitrary and illusory, and therefore the act is void."

Other decisions appropriate are *Palmberg* v. *Kinney,* 65 Or. 220, 228 (132 Pac. 538); *Lorntsen* v. *Union Fisherman's Co.,* 71 Or. 540 (143 Pac. 621); *Pacific Title & Trust Co.* v. *Sargent,* 73 Or. 485 (144 Pac. 452). From these authorities the principle is deduced that any classification made by the legal authorities of a municipality is subject to review by the judiciary, and, further, that the regulation attempted must have some substantial relation to the basis of the classification. Adverting to the terms of the ordinance, we remember that the ground of selection is running a motor vehicle over a particuler route or to a particular point or between particular points and that sight-seeing cars, hotel buses and taxicabs are excluded

from the definition of motor buses. Motor buses as defined in the ordinance and the sight-seeing car, hotel bus and taxicab are all self-propelled by gasoline or electric engines. All take every person offering himself as a passenger. They are all, therefore, common carriers. As between the motor bus and the hotel bus they both run to a particular point; the former to the terminus of its run, and the latter to the hotel to which it is attached, and to no other place. They are identical under the terms of the definition formulated by the ordinance. It cannot be said fairly or with any good reason that the machinery of an automobile running only on a certain street is, for that reason, more liable to get out of order than like machinery of a like nature, controlling a like vehicle operating on all streets of the city indiscriminately. A motor car running on a single street is no more likely to injure pedestrians on that account than the same kind of carriage running where it listeth. It has been argued that it is conducive to good morals that the vehicles under consideration be lighted inside, as required under Section 14. Even so; but unseemly conduct is quite as likely to occur in a taxicab subject to private hire as in a jitney carrying all who apply for passage. Under all these circumstances, it is not equal protection of the law to require inspection or interior lighting of the jitney and not of like vehicles excepted from the operation of the ordinance.

Again, bearing in mind that the distinction upon which the classification is based is the operation on a prescribed route, yet for all practical purposes even this differential disappears in the exceptions allowing jitneys to turn back from their termini during certain hours, to deviate from their routes by consent of passengers, and to go anywhere at will to call for and

deliver passengers at ball games and other points of amusement. In brief, the classification is not only unfair and unreasonable, but in effect has also been obliterated by the exceptions, so that the only substantial characteristic distinguishing the automobile called "motor bus" and the automobiles excepted from the operation of the ordinance is the extra license fee required from the former.

The decree of the Circuit Court should be affirmed.